Lewis HALE and Joyce Hale, Respondents,

v.

Richard L. WARREN and Angelia Warren, and Charles Warren, Appellants.

No. 27934.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 1, 2007.

Michael J. Hackworth, Joy J. Ferguson, Hackworth, Hackworth & Ferguson, L.C., Piedmont, for Appellants.

William B. Beedie, Farmington, for Respondents.

ROBERT S. BARNEY, Presiding Judge.

Richard L. Warren ("Richard"), Angelia Warren ("Angelia") ("the Warrens"), and Charles Warren ("Bud")[1] (collectively "Appellants") appeal the trial court's judgment in favor of Lewis Hale ("Lewis") and Joyce Hale ("Joyce") (collectively "Respon-

---

1. Charles Warren is also known as "Bud" Warren and is referred to as "Bud" throughout the record.

dents") on Respondents' petition for quiet title, injunctions, and trespass.[2] The trial court's judgment quieted title by adverse possession to certain property in Respondents;[3] entered a permanent injunction against Appellants prohibiting them from entering upon the land in question; assessed treble damages in favor of Respondents under section 537.340 for a total amount of $6,300.00; granted Bud $250.00 on his counterclaim against Respondents; and assessed costs against the Warrens. Appellants assert three points of trial court error in this appeal.

Viewing the evidence in the light most favorable to the trial court's judgment, *Harris Land Dev., L.L.C. v. Fields*, 139 S.W.3d 275, 280 (Mo.App.2004), the record reveals that on July 30, 2003, the Warrens purchased 64.5 acres of real estate in Iron County, Missouri. Prior to the purchase of this tract of land, the Warrens had resided on the property for nine years as renters. After their purchase of the land, they intended to build a home on the property and to continue to use the farmland for cattle.

Respondents own "eighty-some acres" of land adjoining the Warrens' land to the south and the east. They purchased forty acres of land in 1966 from Joyce's parents, and they built a home on the property at that time. Respondents purchased an additional forty acres from Joyce's parents in 1989. The land had been in Joyce's family since 1855 and her family had been occupying the property since that time.

After purchasing their property in 2003, the Warrens wanted to have their property surveyed prior to starting construction on their home. They contacted Respondents at that time and requested that the parties share the cost of surveying their shared property lines. Respondents did not accept this offer and the Warrens hired Randall Thurman ("Mr. Thurman"), a surveyor employed by Smith & Company, to survey their property.

On or about March 17, 2004, Mr. Thurman surveyed the Warrens' land and marked their property lines with pink flags. According to Mr. Thurman's calculations, part of Respondents' yard and their entire driveway were actually located on the Warrens' property in addition to the disputed areas of Tracts 2 and 3.

On March 19, 2004, Joyce contacted Angelia about the pink flags which marked the property lines as set out by Mr. Thurman's survey. Joyce informed the Warrens that she disagreed with Mr. Thurman's survey especially with one of the section corners from which measurements were taken.

On March 24, 2004, the Warrens began bulldozing and clearing the land which was set out as their property per the pink flags of Mr. Thurman's survey. Bud, at the request of Richard, bulldozed in front of Respondents' home and along the western border of their property within the area set out by the pink flags. Bud did not bulldoze Respondents' driveway even though it was within the pink flags because

2. For ease of analysis and understanding we have chosen to refer to the parties by their first names. This Court means no disrespect in so doing. Further, we note that Bud is Richard's father.

3. In this matter there are technically three separate tracts of land which are disputed. "Tract 1" is a long, narrow strip of property between Respondents' northern property line

and the Warrens' southern property line on which Respondents' driveway and yard are located. "Tract 2" is a two acre tract which is described in the Warrens' deed, but which Respondents claim by adverse possession. "Tract 3" is a wedge-shaped area of approximately one acre which is described in the Warrens' deed, but which Respondents claim by adverse possession.

Appellants did not want to sever Respondents' access to the county road.

The following day, on March 25, 2004, Respondents obtained a temporary retraining order against Appellants which barred them from "further bulldozing or other acts of destruction and possession...." Appellants then stopped further bulldozing. On April 1, 2004, the restraining order was dissolved by agreement of the parties. Respondents hired a surveyor, Thomas Ruble ("Mr. Ruble"), to survey their property.

On April 18, 2005, Respondents filed a three count petition against the Warrens for adverse possession, trespass, and preliminary and permanent injunctions. Respondents also requested and were granted permission to add Bud as a necessary party to the action. The Warrens filed an answer to the petition on May 3, 2005. After being joined as a party to the lawsuit, Bud filed an answer to Respondents' petition as well as a cross-claim and a counter-claim against Respondents for damage sustained to his bulldozer during the pendency of the temporary restraining order.

A bench trial was held on May 18, 2006. At the close of all the evidence, the trial court found Respondents owned Tracts 1, 2, and 3 by adverse possession; that Mr. Thurman's survey "is not accurate and correct;" that Mr. Ruble's survey "is accurate and correct;" that Mr. Ruble properly determined "the Section Corner common to sections 27, 28, 33 and 34 was lost beyond a reasonable doubt as required by Section 60.301(3) ...;" and that Mr. Ruble properly used "Double Proportionate Measure, as defined at Section 60.301(7) ... to locate the Section Corner common to sections 27, 28, 33 and 34."

The trial court further found that Bud's "conduct with the bulldozer was such so as to incur damages as provided in Section 537.340," and then found that the Warrens "did not have probable cause to believe that the property being dozed was [their] own, and ... are responsible for cutting trees and damaging [Respondents'] real property."

Accordingly, the trial court determined Respondents "suffered damages to the trees, timber and real property in ... Tract 3, in the amount of $2,000.00" and that Respondents suffered "actual damage to ... timber and the real property in ... Tract 2 ..." in the amount of $100.00, "which damages are trebled, for a total sum of $6,300.00 ... pursuant to Section 537.340...." Also, the trial court determined that Bud was entitled to $250.00 on his counterclaim against Respondents for damage to his bulldozer. This appeal followed.

Appellants assert three points of trial court error in this appeal. For ease of analysis, we have chosen to address them out of order.

Appellants' third point relied on asserts the trial court erred in finding that Respondents' survey, which was performed by Mr. Ruble, was correct and reliable. Appellants assert "the section corner common to sections 27, 28, 33, and 34 was not lost as defined by section 60.301 thus the use of double proportionate measure was incorrect." Appellants' second point relied on maintains the trial court erred in finding "that the common corner to sections 27, 28, 33, and 34 as set by Respondents' surveyor, [Mr.] Ruble, was relocated by the use of double proportionate measure." They assert "the evidence presented clearly establishe[d] that Mr. Ruble did not follow the statutory method for double proportionate measure pursuant to section 60.301(7)(b)." Appellants' second and third points are interrelated and we have chosen to address them conjunctively.

This Court reviews a court-tried judgment under the standard of review set out in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court's judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or unless it erroneously applies the law. *Id.* When setting aside a judgment on the ground that it is against the weight of the evidence, appellate courts should proceed with caution. *Id.* An appellate court should set aside a decree or judgment on the ground that it is against the weight of the evidence only if it has a firm belief that the decree or judgment is wrong. *Id.* "When reviewing a court-tried case, we view all evidence and inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences." *Ortmann v. Dace Homes, Inc.,* 86 S.W.3d 86, 88 (Mo. App.2002). Further, we defer to the trial court's determinations as to the credibility of witnesses. *Id.*

Section 60.301 states in pertinent part:

Whenever the following words and terms are used in this chapter they shall have the following meaning unless the context clearly indicates that a different meaning is intended:

* * *

(2) 'Existent corner', a corner whose position can be identified by verifying the evidence of the original monument or its accessories, or by some physical evidence described in the field notes, or located by an acceptable supplemental survey record or some physical evidence thereof, or by testimony. The physical evidence of a corner may have been entirely obliterated but the corner will be considered existent if its position can be recovered through the testimony of one or more witnesses who have a dependable knowledge of the original location. A legally reestablished corner shall have the same status as an existent corner;

(3) 'Lost corner', a corner whose position cannot be determined, beyond reasonable doubt, either from traces of the original marks or from acceptable evidence or testimony that bears upon the original position;

(4) 'Monument', the physical object which marks the corner point determined by the surveying process. The accessories, such as bearing trees, bearing objects, reference monuments, mounds of stone and other similar objects that aid in identifying the corner position, are also considered a part of a corner monument;

* * *

(7) 'Proportionate measurement', a measurement of a line that gives equal relative weight to all parts of the line. The excess or deficiency between two existent corners is so distributed that the amount of excess or deficiency given to each interval bears the same proportion to the whole difference as the record length of the interval bears to the whole record distance:

(a) 'Single proportionate measurement', a measurement of a line applied to a new measurement made between known points on a line to determine one or more positions on that line;

(b) 'Double proportionate measurement', a measurement applied to a new measurement made between four known corners, two each on intersecting meridional and latitudinal lines, for the purpose of relating the intersection to both. The procedure is described as follows: First, measurements will be made between the nearest existent corners north and south of the lost corner. A temporary point will be determined to locate the latitude of the lost corner on the

straight line connecting the existent corners and at the proper proportionate distance. Second, measurements will be made between the nearest existent corners east and west of the lost corner. A temporary point will be determined to locate the longitude of the lost corner on the straight line connecting the existent corners and at the proportionate distance. Third, determine the location of the lost corner at the intersection of an east-west line through the point determining the latitude of the lost corner with a north-south line through the point determining the longitude of the lost corner. When the total length of the line between the nearest existing corners was not measured in the original government survey, the record distance from one existing corner to the lost corner will be used instead of the proportionate distance. This exception will apply to either or both of the east-west or north-south lines....

At trial Mr. Ruble, the surveyor hired by Respondents, testified that he performed a survey on the area in question in the spring of 2004 and that he visited the area during that time on eight to ten occasions. Mr. Ruble testified that in finding the corner location for the intersection of sections 27, 28, 33, and 34, he located "a 5/8 [inch] pin in a stone pile" and "found witness trees" as referred to in a prior survey performed by Sid Nicholson ("Mr. Nicholson"). He stated he had concerns about where Mr. Nicholson "had set the 5/8 pin for this four corner section" because Mr. Nicholson "had used a single proportioning [method] to set the section corner and state statutes require a double proportioning [measurement] if you deem the corner to be lost." In his review of the "original government land office notes ..." on this corner, Mr. Ruble stated the original survey "had calls but [he] could not find any of the original corners." He explained there were two creeks in the area and the original notes "talk about the placement of that four section corner in a creek," but he was unable to specifically place the corner.

Mr. Ruble testified that as a result of being unable to locate the corner, he determined that the corner section location was "lost" as that term was described in section 60.301(3). Mr. Ruble also testified that the reason he deemed the four section corner to be lost was "because [he] couldn't find any of the original [government] evidence," beyond reasonable doubt. He stated that when a corner point is lost, state statute requires him to use double proportionate measurement to find the point. See § 60.301(7)(b). He related that a "double proportionate measure[ment] is supposed to be used as a measure of last resort" when the corner at issue "has been determined lost beyond a reasonable doubt." He further testified that an error in the location of that particular corner would result in "compiling errors" in setting out the remainder of the survey.

Mr. Ruble stated that based on his calculations using double proportionate measurement, the corner "actually fell in the creek itself, in the water ..." so he set the monument "75 foot to the south" because monuments cannot be placed in water. He testified he set his monument, based on double proportionate measurement, in a location that was "120 foot north and 53 foot east" of the pin used by Mr. Nicholson in his former survey. Mr. Ruble stated the effect of this was that Respondents' property line would be located 120 feet farther North than previously calculated by Mr. Thurman's survey. Mr. Ruble also testified that under Mr. Thurman's survey, a portion of Respondents' yard and driveway would fall within the Warrens' property, but under his survey the driveway

would be physically located within Respondents' property.

Mr. Ruble explained that Mr. Nicholson had used a "single proportionate" method to calculate the lost point and that the Warrens' surveyor, Mr. Thurman, had adopted Mr. Nicholson's survey. On the other hand, Mr. Ruble, who used double proportionate measurement, stated that he deemed the corner to be lost and then went "in the north, east, south and west directions" to "find a government corner that [he could] verify to be correct...."

Darrell Pratt ("Mr. Pratt"), an employee of the Department of Natural Resources Land Survey Program, testified that Respondents contacted him regarding "the four corner situation" on their land. He stated that he researched the archives for "the original government survey and any surveys subsequent to the original survey and then went to the sight [sic] to see how much evidence could be recovered of those surveys." He stated the original government notes relating to the corner at issue "set a wood post in a creek, took two ... witness trees and measured on east on a random line ... to another creek." He related he was able to locate the creek in that area but was unable to locate any of the monuments noted in the "government notes." Mr. Pratt also stated that double proportionate measurement "is the method of last resort when all other methods of surveying have completely been exhausted ..." and it was employed if the original corner has been lost. He also related that a corner is considered lost if it is "lost beyond a reasonable doubt" and cannot "be monumented by acceptable evidence or testimony." He further testified that relocating corners using double proportionate measurement almost never "results in the corner being placed exactly where the old land surveyor put it in the original records," but, nevertheless, is the statutorily

required method for re-establishing lost corners.

Mr. Pratt also related that in a 1984 survey performed by D.R. Barfield ("Mr. Barfield") it appeared that Mr. Barfield had used double proportionate measurement to re-establish a different corner in that area. Mr. Pratt also stated that a later survey in October of 1985 performed by Ron Murphy used Mr. Barfield's previously re-established corner together with one other corner for his measurements. He testified, on the other hand, that Mr. Nicholson "did not use proportional measurement" in re-establishing the corner in his survey. Mr. Pratt reviewed Mr. Thurman's survey, which utilized Mr. Nicholson's points, and found that because "Mr. Nicholson did not use the statutory method in the re-establishment of the lost common corner of sections 27, 28, 33, and 34," the actual corner "would be at least one hundred twenty feet north of Mr. Nicholson's rebar." He stated that because of the original government notes relating to the creek bed, it is hard to ascertain for certain the original location of the corner, but it would "still be in the area described in the original survey notes." Mr. Pratt stated that it appeared to him that Mr. Ruble's survey, which employed double proportionate measurement, was more accurate than that of Mr. Thurman's.

Joyce testified she and her husband had never had their land surveyed prior to the present dispute. She related that when they purchased the land from her parents in 1966 her father had walked them around the property to show them the boundary lines. She stated her father mentioned a prior survey and that he based his understanding of the boundary lines on that survey. She stated her father never showed her exactly where "the four section corner" was located that marked the northeast corner of the property, but she

knew it was located near the creek and spring.

Mr. Thurman testified that he stood by the survey work he performed for the Warrens. Mr. Thurman testified that at the corner of sections 28, 27, 33, and 34 he found "a marker, iron rod marking, of record, marking the position of the section corner" which had been placed in the ground by Mr. Nicholson. He stated he found that marker to be reliable and acceptable evidence of the location of that corner. Accordingly, he adopted that corner location and incorporated it into his survey. He stated there was no reason for him to deem the corner lost, because he had found Mr. Nicholson's pin. Mr. Thurman also testified he disagreed with Mr. Ruble's use of double proportionate measurement, asserting that "instead of using double proportioning as a method of last resort ... he's used it as his method of first resort."

■ As previously related, section 60.301 sets out that if a corner is deemed by a surveyor to be lost "beyond reasonable doubt," then that corner may be reestablished by calculations performed by double proportionate measurement. Here, both parties submitted surveys to the trial court. Respondents' surveyor, Mr. Ruble, located a pin set by a prior surveyor, Mr. Nicholson, but was unable to find any of the monuments set in the original government survey. His research revealed that Mr. Nicholson's pin was set using "single proportionate measurement" and Mr. Ruble felt that was an inaccurate location for that pin. As a result, he deemed the section corner to be "lost" and sought to re-establish the corner using double proportionate measurement as set out by section 60.301. Mr. Ruble then set the corner location for sections 27, 28, 33, and 34 at a location "120 foot north and 53 foot east" of the pin used by Mr. Nicholson. Mr.

Platt, having fully researched all of the prior surveys on the area in question, testified that he felt Mr. Ruble's approach was correct and that the corner was properly re-established using double proportionate measurement. On the other hand, Appellants' surveyor, Mr. Thurman, adopted the pin set by Mr. Nicholson and testified he felt it was reliable such that there was no need to deem the corner position to be lost.

We defer to the trial court's determinations as to the credibility of witnesses. *See Ortmann*, 86 S.W.3d at 88. The trial court, as the finder of fact, "may believe all or none of the expert's testimony and accept it in part or reject it in part." *Beardsley v. Beardsley*, 819 S.W.2d 400, 403 (Mo.App.1991). In the present matter, there was sufficient evidence to support the trial court's finding that the corner section location at issue was "lost" and properly re-established in the Ruble survey in conformance with the statutory requirements set out in section 60.301. The trial court did not err in finding section 60.301 was properly utilized in the present matter. Appellants' second and third points relied on lack merit and are denied.

We turn now to Appellants' first point relied on which asserts the trial court erred in awarding Respondents treble damages under section 537.340, because such a ruling "is not supported by evidence and/or is against the weight of the evidence presented at trial...." According to Appellants, the evidence at trial "showed that [the Warrens] had probable cause to believe that the property bulldozed was their own in that they were relying upon a licensed surveyor's represen[t]ations regarding their true property lines."

Section 537.340 "imposes liability for the wrongful cutting down of trees." *McNa-*

*mee v. Garner,* 624 S.W.2d 867, 868 (Mo. App.1981). Section 537.340 sets out:

> If any person shall cut down, injure or destroy or carry away any tree placed or growing for use, shade or ornament, or any timber, rails or wood standing, being or growing on the land of any other person . . . or other substance or material being a part of the realty, or any roots, fruits or plants, or cut down or carry away grass, grain, corn, flax or hemp in which such person has no interest or right, standing, lying or being on land not such person's own, . . . the person so offending shall pay to the party injured treble the value of the things so injured, broken, destroyed or carried away, with costs. Any person filing a claim for damages pursuant to this section need not prove negligence or intent.

▮▮▮ Section 537.340 "is a penal statute which must be strictly construed." *Fondren v. Redwine,* 905 S.W.2d 156, 157 (Mo.App.1995). "A cause of action brought under this penal statute differs from a cause of action brought under common law trespass." *Ridgway v. TTnT Dev. Corp.,* 26 S.W.3d 428, 435–36 (Mo. App.2000). "Statutory trespass attempts to redress plaintiff for injuries that often have intangible qualities, such as aesthetic value, and such damages are often difficult to measure." *Id.* at 436. "Section 537.340 is tempered by [section] 537.360, which states that if defendant had probable cause to believe land was his own, plaintiff shall receive only single damages, with costs."[4] *Id.* "One would have 'probable cause' under the meaning of this section if there is such cause as would induce a reasonable person to believe he had the right to re-

move trees from another's land." *Ridgway,* 26 S.W.3d at 436; *see Segraves v. Consol. Elec. Co-op.,* 891 S.W.2d 168, 172 (Mo.App.1995). The burden of proving probable cause lies with the defendant. *Ridgway,* 26 S.W.3d at 436. "The ultimate decision as to whether treble or single damages should be awarded rests with the trial judge." *Id.*

At trial in this matter, Joyce testified that their driveway had always been located on Tract 1; that they had maintained that area since 1966 as part of their yard; and planted trees and shrubbery in that area as well. Joyce testified that since 1855 Tracts 2 and 3 were owned by her family and farmed by her family. She stated there had been fencing on Tract 2 where the old cars and other things were currently located, but it had been removed by Richard sometime in 2003 without their permission. She stated they had harvested timber and cut firewood on both Tracts 2 and 3 since they purchased the property in 1966. She related that there are four antique vehicles located on Tract 2 and the vehicles had been there since at least 1990. She testified the "pile of heaters and AC units" located on Tract 2 "accumulated in the early 70's . . ." and had been there since that time. She testified that Tract 3 had always been a part of their "yard area." She stated that since 1966 they had utilized Tracts 1, 2, and 3 as their property in a belief that they "definitely" owned the property.

With regard to the present dispute, Joyce testified that in the fall of 2003 Richard "began bulldozing alongside [their] property . . ." in the area referred

---

4. Section 537.360 sets out that only single damages are recoverable, when:

[o]n the trial of any action or prosecution brought upon section[ ] 537.340 . . . it shall appear that the defendant had probable cause to believe that the land on which the

trespass is alleged to have been committed, or that the thing so taken, carried away, injured or destroyed, was his own, the plaintiff in the action or prosecution shall receive single damages only, with costs.

to as Tract 2. She stated that Richard stopped bulldozing shortly thereafter and they never spoke to him directly about it. She testified that on March 17, 2004, she saw Mr. Thurman's pink survey flags and on March 19, 2004, she called Angelia to ask her about them. A few days later Joyce saw Richard and showed him a land abstract in which her grandfather had deeded off a portion of the disputed land for a school building. She testified she showed him the abstract to "show them that obviously this had been in our possession since the 1880's. This particular tract of land that's in dispute." She testified she told the Warrens that she disputed the Thurman survey and that she would speak to Smith & Company herself about Mr. Thurman's survey.

Joyce also testified that on March 24, 2004, that Bud, at the direction of the Warrens, began bulldozing in the disputed areas of Tracts 2 and 3. Joyce testified "[t]hey bulldozed right in front of [her] house along the county road and back off the county road too, they bulldozed down several trees [and shrubs] in there." She stated several "stately," forty-year-old maple trees were bulldozed and at least three shrubs as well as "nine ornamental trees." The next morning Respondents contacted an attorney and obtained a temporary restraining order against the Warrens to stop further bulldozing.

Joyce testified that after bulldozing Appellants left a pile of trees in her front yard and those trees were still there at the time of trial. She stated the disputed areas have not been mowed and are all grown up with grass. She stated her property "[l]ooks pretty bad since [they] can't maintain it" due to the lawsuit. She related she was asking for at least $20,000.00 in actual damages to replace the trees and landscaping which were removed by Appellants.

Lewis testified that when he and Joyce purchased their property in 1966 there was a fence located on Tract 3 which he tore out as well as a fence which went through Tract 2. He testified that he and his wife "ran some pigs" on Tract 3 in 1980 and also had a dairy cow at one time on Tract 3. Lewis testified that since 1966 he has been employed in air conditioning and heating installation and since they purchased the property he has stored a great deal of old equipment on Tract 3 behind "a privacy line of trees." He stated there has continuously been a large pile of "scrap duct work," "flat metal," furnaces, and blowers on Tract 2. He stated he also cut firewood and logs off Tract 2. Lewis testified that one of the trees removed by Bud's bulldozing was "twenty-seven inches at the base." Lewis also testified that "a couple of forty year old maple trees" were removed, two wild cherry trees, two walnut trees, and numerous shrubs. He stated he believed it would cost $20,000.00 to $30,000.00 to replace the lost trees and landscaping.

On the other hand, Richard testified that during the time he and Angelia rented the property they now own he kept cattle on the property and had put up several fences. He stated he removed one fence close to his property line in 2002 or 2003 and replaced it with a newer fence. He stated he never tried to demarcate his property lines with the fencing and that the fencing was merely to keep his cattle in. He stated he had previously cut timber on Tracts 2 and 3 and Respondents did not say anything to him at that time about owning the property. He admitted he had asked "permission" from Lewis in 2001 or 2002 "to use a log road" located on Tract 2 and that Lewis had given him permission to do so. Richard testified that he knew about the cars and scrap metal located on Tract 2 prior to purchasing his property.

He stated he instructed his father, Bud, to bulldoze certain portions of Tracts 2 and 3 because Mr. Thurman informed him that he owned that land. He testified that he "start[ed] clearing pasture because [he] owned the land."

Angelia's testimony regarding their use and actions involving the land at issue was consistent with Richard's testimony.

Bud testified that he followed the survey lines when he was bulldozing and was careful not to bulldoze over any lines. He stated the survey lines went right across Respondents' driveway, but he did not bulldoze the driveway because he "didn't want to mess up the road." He testified he dozed numerous trees but that he did not get any timber out of the trees because the restraining order required them to leave all of the trees where they fell.

Respondents urge that this case is akin to that found in *Brown v. Wilkinson*, 495 S.W.2d 678 (Mo.App.1973). We agree. In *Brown*, 495 S.W.2d at 680, the plaintiffs brought suit for statutory trespass and treble damages against the defendant based on the fact that the defendant cut timber on property owned by the plaintiffs. The defendant asserted he could not be liable for treble damages "because he had probable cause to believe he had the right to cut the timber" in that he had a timber contract with an adjoining landowner and believed the property to belong to that adjoining landowner. *Id.* at 681. The defendant argued that "[b]efore cutting the fence in three places to enter the tract he had a surveyor mark out the true line, which was a hundred feet or so south of the fence line; he then cut timber only to the true boundary line." *Id.* The reviewing court stated that "[s]tanding alone that might show [the] defendant's good faith," however, "the trial court believed otherwise, based on substantial evidence...." *Id.* The *Brown* court pointed out the fol-

lowing evidence against the defendant's position: the timber contract between the defendant and the adjoining landowner "prohibited [the] defendant from damaging fences;" the adjoining landowner told the defendant the fence was his property line and told him he "should not cut timber beyond the fence;" and the defendant "waited until he had cut all timber from [the adjoining landowner's] land and then on one holiday weekend cut the ... fence in three places, cut down all timber and removed it to his stock pile." *Id.* As a result the trial court determined the defendant failed to prove his good faith contention and he was liable for treble damages under the statute. *Brown*, 495 S.W.2d at 681. The reviewing court affirmed the trial court. *Id.*

■ As in *Brown*, there was sufficient evidence to rebut the Warrens' assertions they removed the trees and landscaping at issue because they had probable cause to believe they owned the property.

First, it is important to note that prior to purchasing their property in 2003, the Warrens had also leased the property for nine years. During this period of time it is only reasonable to conclude that being proximately located next to Respondents the Warrens should have became familiar with Respondents' general use of their property. Richard admitted that when he purchased his property he was aware that Respondents stored cars on Tract 2 and maintained a large scrap metal pile on that property. Further, when they purchased the property, the Warrens were aware of the location of Respondents' driveway and yard and their generalized use of Tracts 2 and 3.

Second, as soon as the Warrens had their property surveyed and Mr. Thurman placed his pink flags in the ground, Joyce contacted the Warrens to dispute the sur-

vey lines. She informed them that she was contacting Smith & Company about the survey because she believed it was incorrect and she showed them an old abstract relating to the prior use of the property. She had several telephone conversations with Angelia and at least one conversation with Richard about the issue. The survey flags were placed in the ground on March 17, 2004, and Richard instructed Bud to begin bulldozing the area inside the flags on March 24, 2004. While bulldozing commenced prior to Respondents' survey, it is clear that the Warrens had knowledge of Respondents' open and actual possession and use of the property, and knew that Respondents had issues with the survey lines at the time Bud began bulldozing on Tracts 2 and 3 at the behest of the Warrens.

In arguing the reasonableness of their actions, Appellants point to the fact that they did not bulldoze Respondents' driveway. Such an argument actually highlights the fact that Appellants had personal knowledge of Respondents' use of the land. It is difficult for this Court to believe that "a reasonable person" would "believe he had the right to remove trees from another's land," *Ridgway*, 26 S.W.3d at 436, where he was faced with: a mowed yard and maintained driveway; areas that were clearly used by the landowner for storing scrap metal and other items; open protests and disputes by the landowner; and a survey which obviously did not comport with historically used property lines. Appellants did not meet their burden of proving they had probable cause to believe they owned the land in question at the time they bulldozed the trees and shrubs at issue. *Ridgway*, 26 S.W.3d at 436. The trial court was correct in finding that Appellants' actions were not those of a reasonable and prudent person. "The ultimate decision as to whether treble or single damages should be awarded rests with the trial judge." *Id.* The trial court correctly imposed treble damages against the Warrens as provided in section 537.340. Appellants' first point relied on lacks merit. Point denied.

The judgment of the trial court is affirmed.

LYNCH, C.J., and McGHEE, Senior Judge, concur.