Frederick **LANDWERSIEK**, Sandra Landwersiek, Tim Ward, and Richard St. James, Respondents,

Lonnie Lundry, Appellant,

v.

John **DUNIVAN**, Respondent.

No. 25814.

Missouri Court of Appeals, Southern District. Division Two.

Oct. 27, 2004.

Application for Transfer Denied Dec. 21, 2004.

C. John Pleban, Michael Schaller, St. Louis, for appellant.

Paul Kidwell, Poplar Bluff, for respondent Landwersiek, St. James & Ward.

D. Keith Henson, St. Louis, for respondent, John Dunivan.

ROBERT S. BARNEY, Judge.

Lonnie Lundry ("Appellant") appeals from the trial court's judgment denying his amended petition which sought a recount of an election to elect a member to Public Water Supply District No. 1's ("Water District") Board of Directors, held on June 3, 2003. *See* § 115.583.[1] Appellant also sought injunctive relief and damages. The trial court determined that the Water District election was a nullity, and pursuant to the provisions of section 115.593, ordered a new election because certain qualified voters, including Respondents Frederick Landwersiek, Sandra Landwersiek, Tim Ward and Richard St. James ("Respondents"), were denied the right to vote. Appellant raises two points of trial court error, discussed below. We affirm the judgment of the trial court.

The record reveals that on June 3, 2003, an election was held in Butler County, Missouri, to elect a member to the Board of Directors of Public Water Supply District No. 1.[2] The three candidates vying for the position were Appellant, Thomas Wright ("Wright"), and Deborah Hopkins ("Hopkins"). Respondent John Dunivan ("Dunivan") is the county clerk of Butler County, Missouri, and serves as the election authority for the county. *See* § 115.015.

On June 4, 2003, Dunivan, in his capacity as election authority, certified the election results as follows: Appellant received 203 votes, Wright received 203 votes, and Hopkins received 21 votes. Due to the tie between Appellant and Wright, the Water District president ultimately requested that Dunivan hold a new election.[3] A new election was then scheduled for July 15, 2003.

---

1. Statutory references are to RSMo 2000, unless otherwise specified.

2. The Water District is a county public water supply district which operates pursuant to section 247.010, *et seq.*

3. It appears from the record that neither Appellant nor Wright requested a recount at that time and neither candidate agreed to an informal determination of the election; therefore, the Water District president was forced to request a new election.

However, shortly after Dunivan certified the election results, several irregularities in the election were reported to him. First, it was discovered that election judges working at the Oak Brier precinct, which is located within the Water District, had confused and misinterpreted a map provided to them by Dunivan which denoted the Water District's geographical boundaries. As a result of this misinterpretation, Harold and Georgia Griffin (collectively referred to as the "Griffins"), both of whom reside within the Water District, were denied the right to vote in the election when they arrived at the polling location. Similarly, Jewel Adair, a poll worker at Oak Brier, did not vote in the election because, after examining the map provided by Dunivan, she determined that she did not reside within the Water District's boundaries. Nevertheless, the Oak Brier election judges allowed John and Patricia Helton (collectively referred to as the "Heltons") to vote in the election although they resided outside the Water District and were, therefore, facially unqualified to vote. The Griffins and Ms. Adair submitted voluntary affidavits to the trial court reciting that if they had been allowed to vote in the election they would have voted for Appellant; the Heltons, though ineligible, cast ballots for Wright.

Second, it was also reported to Dunivan that Roy and Karen Winters (collectively referred to as the "Winters") were mistakenly allowed to vote in the Hendrickson precinct. Upon review, Dunivan discovered that the Winters lived three miles outside the Water District, and thus were ineligible to vote in the election. There is no indication in the record for whom the Winters cast their respective votes.

Third, Respondents were also denied the right to vote in the election. Respondents all reside on Roxie Road, an area of Butler County that was annexed into the City of Poplar Bluff (the "city") in October of 2000. At the time of the June 3, 2003, election, the area in which Respondents resided had *not* yet been legally detached from the Water District. *See* discussion herein. As a result, Respondents resided both within the city and within the boundaries of the Water District.

Prior to the election, Dunivan investigated whether Respondents had a legal right to vote in the Water District election.[4] Dunivan testified he spoke with the Secretary of State's office, and following his own prior policies, "determined that the annexation [of Respondents' property] automatically excluded [them] from voting in [the Water District] elections." Dunivan subsequently moved Respondents' registered voting precinct from a county precinct to a city precinct. Accordingly, when Respondents presented themselves at the polling place within the set boundaries of the Water District they were not allowed to vote by the election judges, based on the fact that they resided within an area that had been annexed by the city. No evidence was presented at trial as to the candidate for whom each Respondent would have voted had they been allowed to vote.

Sixteen days after the election, Respondents filed suit against Dunivan and the Water District, alleging that they should have been allowed to vote in the election because the Roxie Road area had not yet

4. We cannot discern from the record whether Dunivan had spoken with all or some of Respondents prior to the election. He maintained at trial that he had advised the election judges and others that the owners of the annexed property would be ineligible to vote in the June 3, 2003, election. Dunivan testified he "believe[d] [Respondent] St. James came to [his] office to see [him] prior to the election, after the election and there were some conversations going on there . . . ."

been legally detached from the Water District at the time of the election. Respondents petitioned to either have their votes added to the June 3, 2003, election results or alternatively be allowed to vote in the newly scheduled July 15, 2003, election. They also requested damages.

Shortly thereafter, Appellant filed a petition for an election contest pursuant to section 115.583. In his amended petition, Appellant requested a declaratory judgment, injunctive relief, damages, and a recount of the votes due to voting irregularities. The trial court consolidated the lawsuits in order to hear the evidence and rule on all of the claims.[5]

On July 2, 2003, the trial court enjoined the election scheduled for July 15, 2003, awaiting "a judicial determination of issues pending between the parties including, but not necessarily limited to, who is entitled to vote and/or which voters should be counted and whether a new election should be ordered."

The trial was held on July 8, 2003. Following the conclusion of the evidence, the trial court found that due to irregularities in the election process "[a] new election for a member to the Water District Board must be held to break the tie vote between [Appellant] and Wright." Further, the trial court held that the annexation of territory by a city does not "automatically and immediately result[ ] in exclusion" of that territory from a water district and until the procedures outlined in Chapter 247 are followed, "the annexed territory remains in

the geographic boundaries of the [W]ater [D]istrict."[6] Accordingly, the trial court set out that "it is possible for the geographic boundaries of a water district and a municipality to overlap until detachment proceedings have been concluded and a judgment detaching and excluding territory from a water district has been entered." The trial court also found that Respondents, as residents of the Water District, were "entitled to vote in the June 3rd election" and "were wrongfully denied that right to vote."

Additionally, the trial court found that Respondents' claims were not barred by the doctrine of laches as contended by Appellant, and that no evidence was presented as to how any of the candidates would be prejudiced by Respondents' participation in a new election or in a recount.

In determining that a new election was warranted pursuant to section 115.593, the trial court found that the remedy of a recount under section 115.583 was not available to Appellant "because there is no evidence as to how [Respondents] would have voted had they been allowed to vote. There is no evidence as to how [the Winters] voted. To determine the right result, therefore, the Court would have to invade the sanctity and privacy of the voting booth." Further, the trial court set out that Dunivan did not know "how many individuals heard about his decision regarding the Roxie Road area prior to the election and did not vote as a result of it"

5. We note that both Appellant and Respondents initiated the underlying lawsuits pursuant to section 115.553, which states in pertinent part:
1. Any candidate for election to any office may challenge the correctness of the returns for the office, charging that irregularities occurred in the election.
2. The result of any election on any question may be contested by one or more registered

voters from the area in which the election was held. The petitioning voter or voters shall be considered the contestant and the officer or election authority responsible for issuing the statement setting forth the result of the election shall be considered the contestee.

6. Appellant does not appear to challenge this latter finding by the trial court.

and, moreover, "[b]ecause unqualified voters voted and their votes could have determined the election, and because an unknown number of qualified voters did not or were not permitted to vote as a result of [Dunivan's] decision, the validity of the entire election is at issue, not just the result." Accordingly, the trial court adjudged that a new election was required. This appeal followed.

Appellant asserts two points of trial court error. First, he argues that the trial court erred in ruling that the doctrine of laches did not bar Respondents' claims. Second, Appellant maintains the trial court erred in ruling that a new election was warranted, instead of a recount of the June 3, 2003, election.

In a court-tried case, our standard of review is that the court's decision will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or erroneously applies the law. *Marre v. Reed*, 775 S.W.2d 951, 952 (Mo. banc 1989); *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We accept as true the evidence and reasonable inferences therefrom in favor of the prevailing party and disregard the contrary evidence. *Evans v. Werle*, 31 S.W.3d 489, 491 (Mo.App.2000). This Court will set aside the trial court's decision only when firmly convinced that the judgment is wrong. *Waldroup v. Dravenstott*, 972 S.W.2d 364, 368 (Mo.App.1998). The credibility of witnesses is a matter for the trial court and it is free to believe none, part, or all of the testimony of any witness. *SD Invs., Inc. v. Michael–Paul, L.L.C.*, 90 S.W.3d 75, 85 (Mo.App.2002). Great deference is given to a trial court on "factual issues because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and oth-er trial intangibles which may not be completely revealed by the record." *Id.* An appellate court defers to the trial court when there is conflicting evidence, even if there is evidence which would support a different conclusion. *Kell v. Kell*, 53 S.W.3d 203, 205 (Mo.App.2001).

As a preliminary observation it is important to note that "Chapter 247 governs public water supply districts." *Public Water Supply Dist. No. 16 v. City of Buckner*, 951 S.W.2d 743, 745 (Mo.App. 1997). "When a city annexes part of a water district's service area, § 247.160.1 permits the district to contract with the city for water service to the annexed area, or to lease, sell, or convey any of its water mains, plant or equipment to the city." *Id.* "This section was enacted to enable a district to transfer the water distribution facilities in the annexed area to the city under circumstances that will protect the right of the district's bondholders." *Public Water Supply Dist. No. 1 v. City of Poplar Bluff*, 12 S.W.3d 741, 745 (Mo.App. 1999). Also, section 247.165, RSMo Cum. Supp.2003 allows for a similar procedure for areas annexed into a municipality, but which are not being served by a water district. "In the event that the city and the water district cannot reach an agreement, § 247.170 allows detachment of the annexed area from the water district pursuant to the circuit court's instruction and supervision." *City of Poplar Bluff*, 12 S.W.3d at 745. Compliance with section 247.170 is mandatory. *Id.*

Accordingly, we conclude that based on the statutory scheme set out in sections 247.150–.170 it is possible for the geographic boundaries of a water district and a city to overlap until detachment proceedings have been concluded and a judgment detaching and excluding territory from a water district has been entered. To rule otherwise, and to hold that annex-

ation automatically excludes territory from a water district, would render the provisions of Chapter 247 meaningless. " 'Missouri Courts do not presume that the legislature enacts meaningless provisions.' " *Day v. Wright County*, 69 S.W.3d 485, 492 fn. 8 (Mo.App.2000) (quoting *Parrott v. HQ., Inc.*, 907 S.W.2d 236, 240 (Mo.App. 1995)). "The general assembly intended to allow a city to acquire water supply rights to a tract in a [water] district's territory, but it obligated the city to obey the procedures for acquiring those rights set out in § 247.170." *City of Buckner*, 951 S.W.2d at 745. Here, no such proceedings have taken place with regard to the Water District and the city. Accordingly, barring some other disqualification, the residents of Roxie Road were entitled to vote in the June 3, 2003, election to elect a member of the Water District's Board of Directors as the trial court properly concluded.

■ We turn now to Appellant's first point of trial court error, where Appellant attacks the trial court's ruling that Respondents' claims were not barred by the doctrine of laches. Appellant maintains Respondents had notice prior to the election that they would not be allowed to vote, therefore, they "unreasonably delayed seeking judicial protection" until after the election and only once it "was apparent that [Appellant] would be declared the winner[.]"[7] He further asserts that their actions prejudiced not only Appellant, but all of the eligible Water District election voters.

■ Invocation of the doctrine of laches " 'requires that a party with knowledge of the facts giving rise to his rights delays assertion of them for an excessive time and the other party suffers legal detriment therefrom.' " *Blackburn v. Richardson*, 849 S.W.2d 281, 289 (Mo.App.1993) (quoting *Lyman v. Walls*, 660 S.W.2d 759, 761 (Mo.App.1983)). For the doctrine to apply, the delay must be unreasonable and unexplained. *Id.* It is important to note that "[m]ere delay in asserting a right does not of itself constitute laches; the delay involved must work to the disadvantage and prejudice of the defendant." *Metro. St. Louis Sewer Dist. v. Zykan*, 495 S.W.2d 643, 656–57 (Mo.1973). The doctrine of laches does not apply where " 'no one has been misled to his harm in any legal sense by the delay, and the situation has not materially changed.' " *Port Perry Mktg. Corp. v. Jenneman*, 982 S.W.2d 789, 792 (Mo.App.1998) (quoting *Zykan*, 495 S.W.2d at 657).

As support for his contention that the doctrine of laches is applicable to the present matter, Appellant cites to *Toney v. White*, 488 F.2d 310 (5th Cir.1973) and *Moore v. City of Pacific*, 534 S.W.2d 486 (Mo.App.1976). He asserts that "[i]f a party knows, within a reasonable time, prior to an election that he will be denied the right to vote, he is required to exercise due diligence and pursue all available pre-election remedies as a condition precedent to seeking post election relief." Therefore, according to Appellant, Respondents

---

7. In his brief, Appellant argues that Respondents had notice of their inability to vote in the Water District election as early as October of 2000 when their property was annexed into the city. He goes on to reference various other ways that they were aware of this issue, and therefore, should have sought a remedy prior to the election. However, while Appellant details these instances, he fails to direct this Court to the portion of the record where this evidence could be reviewed. This Court is not required to seine through the record to find support for Appellant's factual statements, and we choose not to do so. *See O'Dell v. State*, 835 S.W.2d 548, 551 (Mo.App. 1992). Additionally, we note that this is not an issue of notice, as argued by Appellant. It is a question of the applicability of the doctrine of laches.

should have requested judicial aid prior to the election as opposed to after the election.

We find Appellant's argument, as well as his cited cases, to be unpersuasive.

In *Toney*, African–American voters filed suit to set aside the results of a primary election after the voting registrar purged the voting rolls in a racially discriminatory manner. *Toney*, 488 F.2d at 311. The main question in *Toney* was "what diligence in seeking pre-election judicial relief was required of plaintiffs under the circumstances," where there was an indication that some parties had notice of the discrimination prior to the election. *Id.* at 314. While setting out that "the law imposes the duty on parties having grievances based on discriminatory practices to bring the grievances forward for pre-election adjudication," the *Toney* court also found that "[t]his reasoning is sound in the abstract but must be applied to the facts and circumstances obtaining in the particular case." *Id.*

In *Toney* the plaintiffs filed their suit one month following the election at issue.[8] The Fifth Circuit seasonably affirmed the judgment of the Western District of Louisiana which set aside the election. *Id.* at 316. The prior election was declared void and a new election ordered. While *Toney* is similar to the instant matter, it is significant that in *Toney* the filing of the complaint within a month after the election was deemed to be reasonable. Accordingly, it should be reasonable in the instant matter where Respondents filed suit sixteen days after the election.

In *Moore*, the appellant was present at an aldermanic meeting where an ordinance

was passed that revised the boundary lines for several wards in the City of Pacific. *Moore*, 534 S.W.2d at 491. Instead of challenging the ordinance at that time, the appellant stood for election in one of the districts, lost the election, and only then did he challenge the validity of the redistricting ordinance. *Id.* at 491. In pertinent part, the court in *Moore* denied the appellant relief because the appellant had actual notice of the ordinance's passage in that he was present at the meeting when the redistricting ordinance was passed, but failed to seek any relief until after the election. *Id.* at 498. In this respect, *Moore* is factually distinguishable from the instant case because the matter at hand does not involve redistricting or due process claims arising from redistricting. Furthermore, Respondents were not candidates for office.

■ Returning to the instant matter, we note that the applicability of the doctrine of laches is a question of fact to be determined by the trial court. *Mackey v. Griggs*, 61 S.W.3d 312, 317 (Mo.App.2001). The doctrine of laches is based on the "inequity of permitting a claim to be enforced [and] this inequity being founded upon some change in the condition or relations of the property or the parties." *Lyman*, 660 S.W.2d at 761. Accordingly, we determine that the doctrine of laches does not apply here.

■ First, it is not clear how Respondents ostensible delay was unreasonable under the circumstances. They waited until after they were actually harmed to bring their action, i.e., when the case ripened to a justiciable controversy.[9]

<hr/>

8. A little more than two months after the election the United States Department of Justice also joined the suit as a plaintiff.

9. We note that "[i]n a declaratory judgment action, the trial court is limited to determining actual controversies in existence at the time of the declaratory judgment." *Schreiner v. Omaha Indem. Co.*, 854 S.W.2d 542, 544

They brought their action within a reasonable period of time, some sixteen days after the election, as compared with the *Toney* plaintiffs who brought their action thirty days after the election. Under the circumstances of this case, there is nothing "unreasonable or unexplained" in Respondents' actions that would warrant application of the doctrine of laches. *See Blackburn*, 849 S.W.2d at 289.

Second, we fail to see how Appellant was prejudiced by any action or inaction of Respondents. As discussed in Appellant's second point on appeal below, ultimately the only proper result in this matter was a new election. Regardless of whether or not Respondents had voted in the original election, a new election was necessitated based on various irregularities discussed more fully below. Appellant's first point is denied.

■ In his second point on appeal, Appellant attacks the trial court's ruling that a recount was not an available remedy. He argues that there "is a prima facie showing of irregularities which place the result of the election in doubt" and that but for those irregularities he would have won the election. Appellant contends that the proper remedy was a recount pursuant to section 115.583.

■ The right to contest an election exists only by virtue of statute and the jurisdiction of the circuit court is confined to those statutory provisions governing election contests. *State ex rel. Wilson v. Hart*, 583 S.W.2d 550, 551 (Mo.App.1979); *see also Hockemeier v. Berra*, 641 S.W.2d 67, 68 (Mo. banc 1982). An "election contest challenges the validity of the very process by which we govern ourselves; it alleges that through an irregularity in the conduct of an election, the officially announced winner did not receive the votes of a majority of the electorate." *Foster v. Evert*, 751 S.W.2d 42, 43–44 (Mo. banc 1988). "If as a result of election irregularities the wrong candidate is declared the winner, more is at stake than the losing candidate's disappointment; the people have lost the ability to impose their will through the electoral process." *Id.*

■ The election laws in Missouri provide for two remedies when irregularities are shown in an election contest. First, section 115.583 permits the circuit court to order a recount "[i]f [it] finds there is a prima facie showing of irregularities which place the result of any contested election in doubt...." "[A] prima facie case is made if the validity of a number of votes equal to or greater than the margin of defeat is placed in doubt." § 115.583. The term "result" as used in section 115.583 refers to the official announcement of the winning candidate and not the *conduct* of the election. *Bd. of Election Comm'rs of St. Louis Cty. v. Knipp*, 784 S.W.2d 797, 798 (Mo. banc 1990).

The second remedy, which is authorized by section 115.593, allows the circuit court to order a new election "[i]f the court ... trying a contested election determines there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election." A new election is a more drastic remedy than a recount. *Knipp*, 784 S.W.2d at 798.

We agree that the decision to overturn an election should not be taken lightly, however, the record reveals there were irregularities of sufficient magnitude to require a new election in the present matter.

(Mo.App.1993). Thus, a party may seek a declaratory judgment only when the action involves a justiciable controversy, a legally protectable interest, and an issue ripe for review. *Gunnels v. Valley Forge Ins. Co.*, 854 S.W.2d 65, 66 (Mo.App.1993).

*See Barks v. Turnbeau,* 573 S.W.2d 677, 682 (Mo.App.1978).

Respondents were not permitted to vote in the Water District election although they were residents of the Water District. Of similar import is the fact that the record shows, and the trial court found, that there were an indeterminable number of other Roxie Road residents that lived in the Water District and who might have been aware of Dunivan's mistaken assertions that they were unqualified to vote. Therefore, it is impossible to determine how many of those potential voters stayed away from the polls altogether.

Additionally, the irregularities in this particular election were not limited to the mere exclusion of Respondents' votes. There remains the issue of the ballots cast by the Heltons and the Winters, all of whom were unqualified to vote. "[B]allots cast by those who are not qualified to vote contaminate the reported results[.]" [10] *Marre,* 775 S.W.2d at 953. While there was evidence that the Heltons voted for Wright, there was no evidence for which candidate the Winters voted. We cannot neglect to consider the fact that the Griffins and Ms. Adair were qualified to vote and did not vote due to the mistake of the election judges in the Oak Brier precinct. Also, there was conflicting evidence regarding the existence of two additional unidentified voters who may have been turned away from the Oak Brier precinct. Based on the above detailed irregularities, a recount would simply not do justice in this matter. The irregularities here can only be cured through a new election. The trial court was correct in finding there were sufficient irregularities to order a new election pursuant to section 115.593.

*See Marre,* 775 S.W.2d at 953–56. Appellant's second point is denied.

The judgment of the trial court is affirmed.

PARRISH, P.J., and SHRUM, J., concur.

---

**10.** As stated in *Marre,* "Because voting by unqualified voters is an irregularity examined by the court in conducting a recount, it follows that such an irregularity may be considered in determining whether a new election should be ordered." *Marre,* 775 S.W.2d at 953–54.