**Gil and Joan LAU, Respondents,**

v.

**Ken PUGH, Appellant.**

**No. SD 29289.**

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 1, 2009.

John Price, Springfield, for Appellant.

Jason Coatney, Springfield, Lucius B. Lau, visiting Atty. of Fairfax, VA, for Respondents.

ROBERT S. BARNEY, Judge.

Ken Pugh ("Appellant") appeals the judgment of the trial court entered in a civil suit filed against him by Gil ("Mr. Lau") and Joan Lau ("Mrs. Lau") (collectively "Respondents"). The trial court's judgment ruled: (1) in favor of Respondents on their claim against Appellant for a declaratory judgment finding Appellant's mechanic's lien to be null and void; (2) in favor of Respondents on their claim for slander of title; (3) in favor of Respondents on Appellant's counterclaim for quantum meruit; and (4) in favor of Appellant on Appellant's counterclaim for trespass. Appellant now raises four points of trial court error.

Viewing the evidence in the light most favorable to the judgment of the trial court, *Ridgway v. TTnT Dev. Corp.*, 126 S.W.3d 807, 812 (Mo.App.2004), the record reveals Appellant and Respondents are neighboring landowners that share a common east-west property boundary line.[1] Appellant and his wife, Linda Pugh ("Mrs. Pugh"), purchased their 20–acre property in 1998 and began residing there on a full-time basis in 2002. Respondents began residing on their 12–acre property in 2004. The parties were neighborly to one another and often visited each other's homes; invited each other over for dinner and to play cards; and watched over each other's property during vacations. Respondents also allowed Appellant and his family to fish in their pond; hunt on their property; and otherwise utilize their land as they desired.

In early 2006, Mr. Lau approached Appellant "to come up and teach him how to bring a tree down;" Appellant "offered to help him;" and Appellant ended up "helping [his] neighbor" by cutting three trees down for Mr. Lau. Mr. Lau told Appellant at that time that he was planning on growing Morel mushrooms and that he would "supply [Appellant] with mushrooms for the rest of [his] life." Appellant spent approximately five hours working on the trees and Mrs. Pugh helped him for approximately three hours as well. There was no discussion of monetary payment for the services of Appellant and Mrs. Pugh, and Mr. Lau was under the impression that Appellant was helping out in a "neigh-

---

1. There is apparently no fence or other markings specifically delineating this boundary line.

borly" way. Ultimately, Mr. Lau did not grow any mushrooms.

Around the time that Appellant aided Mr. Lau with cutting down the three trees, the parties entered into several discussions relating to the boundary line of their properties. According to Mr. Lau, they agreed that the exact boundary line was not important as long as they all agreed not to damage the property in that area.

At some point in time, approximately May of 2006, Respondents hired Wayne Davis ("Mr. Davis") to utilize a piece of heavy equipment to cut down nine to twelve trees on their own property "for the purpose of selling the trunks." Mr. Davis cut the trees down and placed the remaining leaves and limbs into an already existing brush pile located in the vicinity of the boundary line between the parties' property.[2] After this was completed, Mrs. Lau telephoned Mrs. Pugh and informed her that she was afraid that the brush pile might not be located on Respondents' property. Upon learning this information, Appellant and Mrs. Pugh told Respondents "to move it" since it was located on Appellant's property as opposed to Respondents' property. Appellant and Mrs. Pugh then notified Respondents by letter that the brush pile was located on their property and Respondents had wrongfully placed their tree debris in the brush pile.[3]

The parties met at the larger brush pile sometime in June of 2006 to discuss the issue. A heated disagreement ensued during which Appellant said he would "see that [Respondents] never sell this property."[4] The parties came to no resolution as to the location of the boundary line or a solution to the problem with the brush pile in question. Mrs. Lau spoke with Mrs. Pugh on the telephone sometime thereafter and indicated that Respondents would arrange to have the brush pile moved onto what they felt was their property and Mrs. Pugh "didn't seem upset about it or anything ... at all."

Shortly after the meeting at the brush pile, Mr. Lau hired Justin Wetstein ("Mr. Wetstein") to use a piece of heavy equipment to move the brush pile to Respondents' property and to place a line of logs along what he believed to be the property boundary line so that "anybody visiting [him] w[ould] not trespass on [Appellant's] property."[5]

In July of 2006, Appellant prepared an invoice for the work he did cutting down trees on Respondents' property in early 2006. This invoice charged Respondents $150.00 per tree for a total amount owed of $450.00. Appellant mailed this invoice in September of 2006 along with a "Statement of Mechanic's Lien" that he had filed against Respondents' property on September 18, 2006. Mr. Lau testified that he

---

**2.** Appellant testified both that there was not an existing brush pile in this area prior to May or June of 2006 and that there was an existing brush pile in that area prior to that time. Mrs. Pugh testified there was not a brush pile on the land when they purchased the property.

**3.** Appellant also testified that a second smaller brush pile containing oil cans, various pieces of metal, and other debris was created around this time on his property and that he had not created it.

**4.** Appellant denied making such a comment to Respondents.

**5.** Mr. Wetstein testified that he was hired to "move a brush pile" with a bulldozer and his employees did not take out any trees while they were there completing the job. James Woods, a neighbor of both parties, testified that he was familiar with the larger brush pile at issue, which he estimated was 40 feet by 20 feet in size, and he further related it was not uncommon for people to have more than one brush pile of this size on property out in the country.

never received notice from Appellant of his intention to file a mechanic's lien against them.

Later Respondents had the land surveyed. The survey revealed that their property line was approximately 50 to 100 feet back from the brush pile such that they were made aware that they had employed both Mr. Davis and Mr. Wetstein to perform work on Appellant's property as opposed to their own.[6]

On January 5, 2007, Respondents filed their two-count petition against Appellant. Respondents' first count requested a declaratory judgment relating to the validity of the mechanic's lien filed by Appellant and their second count asserted an action for slander of title against Appellant for "maliciously" and "without justification" filing the mechanic's lien against them. On February 14, 2007, Appellant filed his "Answer to Petition and [Counterclaim]" against Respondents. In Count I of his counterclaim, Appellant asserted a claim for trespass against Respondents based on Respondents' entry upon his land "[a]t various and sundry times" including when they employed people to move the brush piles and purportedly removed and damaged trees while committing this trespass. Appellant's second count was for quantum meruit in which he requested to be paid the $450.00 he asserts he was owed for

helping Respondents remove their three trees in early 2006.

Prior to trial, Appellant apparently released his mechanic's lien on Respondents' property.

A trial was held on January 17, 2008. In addition to the evidence adduced above, there was testimony from several witnesses on the issue of damages for the trespass to Appellant's property. Kathleen Yarbrough ("Ms. Yarbrough"), a "horticulturist with a specialty in erosion control and drainage," testified she was hired by Appellant in May of 2007 to evaluate the "bare," "scraped" areas of his property and develop a "scenario which would restore the property as closely as possible to what it was as quickly as possible." She opined that it would take approximately ten trees, the creation of a mulched berm of soil, a system for watering the new trees, and other steps to restore the "general nature of the land." She testified that such remedial steps would cost approximately $15,000.00.

Susan Michelle Short ("Ms. Short"), a real estate appraiser, was called by Respondents as an expert witness. She testified she had examined photographs of Appellant's property and looked at twenty-eight property cards from the county assessor's office to come up with comparable prices for property in their area so that she could determine the value of Appel-

---

**6.** Appellant testified that Respondents had caused numerous large trees to be removed from Appellant's property around this time and he saw stumps which he felt had been recently cut. He further stated that around this time the smaller brush pile was moved but it was merely incorporated into the larger brush pile. He also testified that Respondents had a portion of his property cleared, "scraped and widened" almost as if to put in a road and there had formerly been "[h]eavy woods" in that location. He related he thought that a second bare and scraped area was where the brush pile had been located

prior to it being moved by Mr. Wetstein. He also testified that as a result of the bare areas on his property he was having drainage issues, his pond would not retain water, and there was a sinkhole in that area. Appellant opined that his property was damaged in the amount of at least $15,000.00. He reached this conclusion based on the "[n]ormal rule of thumb" that "if property has debris and junk on it, it depreciates the value approximately 5 to as much as 15 percent of the value." He stated that his property was worth $300,000.00 such that the damage to his property was $15,000.00.

lant's land per acre. She concluded that the market value of Appellant's property was reduced by approximately $2,200.00 such that he was damaged in that amount by Respondents' trespass.

At the close of all the evidence, the trial court took the matter under advisement. On June 13, 2008, the trial court entered a judgment in which it found on Respondents' claim for declaratory judgment that "the mechanic's lien filed by [Appellant] be found null, void and of no effect. The Court further finds that [Respondents] did not hire [Appellant] to perform any services nor did [Appellant] announce that labor would be performed in expectation of remuneration, but instead was a gratuitous offer by [Appellant] to assist his neighbors." The trial court then found in favor of Respondents on their claim for slander of title and ordered Appellant to pay Respondents "the sum of $1,814.67 and for Court Costs." Turning to Appellant's counterclaims, the trial court found against Appellant on his claim for quantum meruit and in favor of Appellant on his claim of trespass for which Respondents were ordered to pay "$3,100.00 and for Court Costs." This appeal by Appellant followed.

■ The standard of review of a court-tried case is established by Rule 84.13(d).[7] This Court is required to sustain the judgment of the trial court "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Beavers v. Rec. Ass'n of Lake Shore Estates, Inc.*, 130 S.W.3d 702, 708 (Mo. App.2004); *see Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).[8] " 'In assessing if there is substantial evidence, we must defer to the trial court on factual

issues and cannot substitute our judgment for that of the trial judge.' " *Kleeman v. Kingsley*, 167 S.W.3d 198, 202 (Mo.App. 2005) (quoting *Chapman v. Lavy*, 20 S.W.3d 610, 612 (Mo.App.2000)). In our review, this Court defers to the trial court in issues of witness credibility and " 'accepts as true the evidence and inferences favorable to the trial court's judgment, disregarding all contrary evidence.' " *Kleeman*, 167 S.W.3d at 202 (quoting *Behr v. Bird Way, Inc.*, 923 S.W.2d 470, 472 (Mo.App.1996)).

In his first point relied on, Appellant maintains the trial court erred in finding his statement of mechanic's lien "was null, void and of no effect" because there was no justiciable controversy at the time of trial in that he had released the mechanic's lien such that there was no longer "a cloud on [Respondents'] title ..." and there was no "impact[ ] on [Respondents'] ability to market the [p]roperty" as argued in Respondents' petition.

■ "When reviewing an action for a declaratory judgment, our standard of review is the same as in any other court tried case." *Harrison v. DeHeus*, 230 S.W.3d 68, 74 (Mo.App.2007); *see Murphy*, 536 S.W.2d at 30. " 'This Court will set aside the trial court's decision only when firmly convinced that the judgment is wrong.' " *Harrison*, 230 S.W.3d at 74 (quoting *Landwersiek v. Dunivan*, 147 S.W.3d 141, 146 (Mo.App.2004)).

■ Here, Appellant's assertions that the mechanic's lien was moot was not self-proving, particularly at the time the trial court was considering Count I of Respondents' pleadings and Respondents' request for a declaration that the mechanic's lien filed by Appellant was null and void and of

---

7. All rule references are to Missouri Court Rules (2007).

8. *Murphy* interpreted the provisions of then Rule 73.01(c).

no effect. The matter was not moot. The trial court was required to hear evidence and testimony preliminary to rendering a decision on the issues raised by Respondents. As stated in Rule 73.01(c), "[t]he court shall render the judgment it thinks proper under the law and evidence." In this connection, Appellant acknowledged filing a document "called a mechanic's lien . . .;" acknowledged that he "eventually withdrew it . . .;" and that he did so because "there was a technical problem on the way [h]e had filed the notice and maybe even on the size of the font." Appellant also acknowledged that he had not "post[ed] notice on [Respondents'] property or give[n] them notice that failure to pay [him] would give [him] the authority to file a mechanic's lien" nor did he mail Respondents such notice. When cross-examined as to why he waited from the time he filed his counterclaim in February of 2007 until April of 2007 to release his mechanic's lien, Appellant testified that he had "authorized the release. . . . It just didn't happen." Appellant was then shown a document entitled "Exhibit M" which Appellant testified was "entitled release of mechanic's lien" and contained his signature. This exhibit was not presented to the trial court for purposes of receipt into evidence and it is not before this Court. However, there is sufficient evidence before this Court supporting the trial court's determination that the mechanic's lien was null and void and of no effect. Here, it was Appellant's burden to prove the trial court erred in rendering a decision on Respondents' Count I. Appellant has not met his burden that such a finding was moot. Point denied.

In his second point relied on, Appellant asserts the trial court erred in awarding damages on Respondents' slander of title claim because such an award "erroneously declared or applied the law and the judgment is not supported by substantial evidence. . . ." Specifically, he maintains a request for attorney's fees is a request for special damages which must be specifically pleaded and proven in order to recover, which was not done in Respondents' petition. Further, he argues attorney's fees are not recoverable in a slander of title action. He also maintains that since attorney's fees were not recoverable as an element of damages and Respondents introduced no other evidence of actual damages the "judgment was not supported by any competent and substantial evidence of actual damages."

Based on this Court's review of the case law in this area, it appears that the issue of whether attorney's fees incurred in a slander of title action are recoverable as damages is one of first impression in Missouri. Our review of analogous cases, decisions in other jurisdictions, and the Restatement (Second) of Torts (1977), sections 624 and 633, persuades this Court that attorney's fees and other legal expenses incurred in clearing the disparaged title are recoverable as damages in the common law action of slander of title. *See Rorvig v. Douglas*, 123 Wash.2d 854, 873 P.2d 492 (1994).[9]

Initially, we note that in order to establish a claim for slander of title "the plaintiff [must] demonstrate: 1) some interest in the property, 2) that the words published were false, 3) that the words

---

9. As explained in *Rorvig*, 873 P.2d at 497:
 the Restatement (Second) of Torts supports allowing recovery of attorney fees in a slander of title action. It describes slander of title as a form of the general tort of publica-

 tion of an injurious falsehood. Thus, the rules on liability for the publication of an injurious falsehood also apply to slander of title.

were maliciously published,[10] and 4) that he suffered pecuniary loss or injury as a result of the false statement." *Bechtle v. Adbar Co., L.C.,* 14 S.W.3d 725, 728 (Mo. App.2000). We also observe that Missouri recognizes a claim for "injurious falsehood." *See State ex rel. BP Products N. Am., Inc. v. Ross,* 163 S.W.3d 922, 928 (Mo. banc 2005); *Annbar Assocs. v. Am. Exp. Co.,* 565 S.W.2d 701, 706 (Mo.App. 1978) (referencing section 623A of the Restatement (Second) of Torts (1977)). In this connection, the plaintiff in an injurious falsehood case must establish "[p]roof of pecuniary loss" as "an element of a claim for damages for injurious falsehood." *Annbar Assocs.,* 565 S.W.2d at 708. " 'Pecuniary loss' " has been described as a " 'loss of money or of something having monetary value.' " *Ross,* 163 S.W.3d at 929 (quoting BLACK'S LAW DICTIONARY 957 (7th ed.1999)). Restatement (Second) of Torts section 633 (1977) treats the issue of pecuniary loss in association with claims for "Injurious Falsehood (Including Slander Of Title And Trade Libel)." Section 633 of the Restatement (Second) of Torts (1977) sets out:

(1) The pecuniary loss for which a publisher of injurious falsehood is subject to liability is restricted to

 (a) the pecuniary loss that results directly and immediately from the effect of the conduct of third persons, includ-

ing impairment of vendibility or value caused by disparagement, and

 (b) the expense of measures reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon vendibility or value by disparagement; [11]

*See also* James O. Pearson, Jr., J.D., Annotation, *What Constitutes Special Damages in Action for Slander of Title,* 4 A.L.R.4th 532, 560–62 (1981); *Paidar v. Hughes,* 615 N.W.2d 276, 280 (Minn.2000); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 128 at 972 (5th ed.1984).

It appears the clear majority of other jurisdictions that have considered this issue hold, consistent with the Restatement, that attorney's fees expended in an effort to clear a disparaged title are recoverable as special damages in a slander of title action. In *Rorvig,* 873 P.2d at 497, the Washington Supreme Court employed the reasoning of the Restatement in finding "that attorney fees and other legal expenses incurred in clearing the disparaged title are recoverable as damages in the common law action of slander of title." The Utah Court of Appeals similarly held in *Gillmor v. Cummings,* 904 P.2d 703, 708 (Utah Ct.App.1995) (quoting *Bass v. Planned Mgmt. Servs., Inc.,* 761 P.2d 566,

---

10. In a slander of title action, whether the defendant acted with malice is a question for the trier of fact where a fair difference of opinion exists on the issue of malice. *See Tongay v. Franklin Cty. Merc. Bank,* 735 S.W.2d 766, 770 (Mo.App.1987).

11. Section 633 of the Restatement (Second) of Torts (1977) sets out at Comment b that: [t]he rules stated in this [s]ection are applicable to the publication of any injurious falsehood within the rules stated in [section] 623A, including the disparagement of another's property in land and other things (see [section] 624 [Disparagement of Prop-

erty—Slander of Title] ) and disparagement of their quality. (See [section] 626).
Additionally, Comment k of the Restatement (Second) of Torts (1977) section 633, sets out in part that:
[t]he rule stated in this Clause is primarily applicable to the disparagement of property in land. . . .
The rule stated is not, however, limited to the expense of bringing an action. It applies equally to the expense of defending one, if the action is the direct and immediate result of the influence of the publication upon the conduct of third persons.

568–69 (Utah 1988)), that "while special damages 'are ordinarily proved in a slander of title action by evidence of a lost sale or the loss of some other pecuniary advantage,' attorney fees may be recoverable as special damages if incurred 'to clear title or to undo any harm created by whatever slander of title occurred.'" Likewise, the New Mexico Court of Appeals found in *Den–Gar Enter. v. Romero*, 94 N.M. 425, 611 P.2d 1119, 1124 (1980), that "in a slander of title action, the amount of attorneys' fees incurred to quiet title is not allowed merely as an extra expense of the suit, *but is a measure of damages itself*." (Emphasis added). Further, in *Paidar*, 615 N.W.2d at 280–81, the Minnesota Supreme Court found that attorney fees are allowed in slander of title actions because "one party's tortious conduct necessitated litigation by the other party."

Further, in *Sullivan v. The Thomas Org.*, 88 Mich.App. 77, 276 N.W.2d 522, 526 (1979), the court of appeals of Michigan determined that the "filing of an invalid lien may be a falsehood, even if the matter contained in the lien is correct." In countering the defendant's argument that because the *Sullivan* "plaintiffs have failed to allege 'special' damages, because mere unmarketability of title without the actual loss of a sale is not compensation injury," the court of appeals found that "reasonable expenses incurred by the plaintiff in removing the cloud from his title were recov-

erable as damages in a disparagement of title action." *Id.* at 526; *see also Chesebro v. Powers*, 78 Mich. 472, 44 N.W. 290 (1889).

Based on the foregoing, there seems to be no sound reason based upon either precedent or policy why Missouri should not adopt the majority view espoused by the Restatement that attorney fees and other legal expenses incurred in clearing a disparaged title are recoverable as special damages in slander of title actions. *See Porter v. Crawford & Co.*, 611 S.W.2d 265, 272 (Mo.App.1980). "None of the principles relied upon in the evolution of the doctrine are foreign to our law. The concept is consistent with the mandate of our organic law that there should be a remedy for every injury." *Id.* Additionally, historically "Missouri has not been reluctant to adopt new [issues] in tort [law] based on Restatement principles" such as the tort of "injurious falsehood, a cause of action based upon [section] 623A Restatement (Second) of Torts . . . ," and the tort of "invasion of privacy, relied upon Restatement (Second) of Torts [section] 652A." *Id.* (internal citations omitted). Accordingly, when properly pled, attorney's fees expended in clearing a disparaged title are recoverable as special damages in a slander of title action.[12]

 With that being said, Appellant argues that even if attorney fees are recoverable in a slander of title action Respon-

---

**12.** We note a minority of jurisdictions extend this rule to allow the recovery of attorney's fees for the entire cost of the slander of title litigation, not just the attorney fees expended in clearing up the disparaged title as the Restatement recognizes and the majority of jurisdictions hold. For example, the Ohio Court of Common Pleas found in *McClure v. Fischer Attached Homes*, 146 Ohio Misc.2d 57, 889 N.E.2d 602, 610 (Ohio Com.Pl.2008), that "a party could recover the attorney fees incurred in removing a cloud on title as 'special damages,' and could also recover attor-

ney fees for prosecuting a slander of title action." This Ohio rule is based on the awarding of attorney's fees that are historically dissimilar to the rule found in Missouri. Additionally, in *Horgan v. Felton*, 123 Nev. 577, 170 P.3d 982, 988 (2007), the Supreme Court of Nevada found that attorney fees *are always available in slander of title actions* as opposed to only being available "when a litigant seeks to remove a cloud upon title." We reject this minority view as being inconsistent with sections 633 and 624 of the Restatement (Second) of Torts (1977).

dents have failed to properly request such relief. "'Attorney's fees are special damages which must be specifically pleaded to be recovered.'" *Ridgway,* 126 S.W.3d at 818 (quoting *Fisher v. Fisher,* 874 S.W.2d 543, 546–47 (Mo.App.1994)). "'Special damages are the natural but not [the] necessary result of the wrongful act.'" *Shirley's Realty, Inc. v. Hunt,* 160 S.W.3d 804, 809 (Mo.App.2005) (quoting *Brown v. Merc. Bank of Poplar Bluff,* 820 S.W.2d 327, 338 (Mo.App.1991)). Rule 55.19 requires that items claimed as special damages be specifically pled.

In *Ridgway,* 126 S.W.3d at 818, this Court found the plaintiffs failed to properly plead attorney's fees where their petition "did not contain any request for attorney fees in either the body of the petition or the prayer for relief" and the issue of attorney's fees was first raised "in a memorandum outlining their request for damages after remand." Likewise, in *Fisher,* 874 S.W.2d at 547, the plaintiffs request for attorney's fees was not properly pled where they "failed to request attorney's fees in their petition: They merely requested 'costs for the disbursement of this action.'"

■■■■ Here, Respondents' petition at Count II sets out that "[a]s a result of the mechanic's lien, [Respondents] have suffered and will suffer pecuniary loss."[13] Section 633(1) of the Restatement (Second) of Torts (1977) describes "pecuniary loss" as

(a) ... result[ing] directly and immediately from the effect of the conduct of third persons, including impairment of vendibility or value caused by disparagement, and

(b) the expense of measures reasonably necessary to counteract the publication, *including litigation to remove the doubt cast upon vendibility or value by disparagement.*

(Emphasis added.) Moreover, the petition goes on to request in the prayer for relief that the trial court "order [Appellant] to pay reasonable damages, in an amount to be established at trial, for slander of title, for suit costs, for reasonable attorney fees, and for such other and further relief as the [c]ourt deems just and proper." *See Ridgway,* 126 S.W.3d at 818. Thus, in seeking redress for their "pecuniary loss," as well as praying for reasonable attorney's fees, we determine attorney's fees were properly pleaded by Respondents as special damages pursuant to Rule 55.19. "'The character of a cause of action is determined from the facts stated along with the relief sought.'" *State Ex Rel. BP Products,* 163 S.W.3d at 927 (quoting *Prindable v. Walsh,* 69 S.W.3d 912, 914–15 (Mo.App. 2002)).

■■■■ Lastly, outside of special damages in the form of attorney's fees arising from Respondents' expenditures relating to clearing their disparaged title, we agree that Respondents have otherwise introduced no other evidence of actual damages arising from their claim for slander of title. This brings into question the amount of attorney's fees that the trial court awarded Respondents in this action. Mr. Lau testified that his total legal expenses, including the date of trial, were $5,755.84. The trial court awarded Respondents the sum of $1,814.67. "'The trial court is considered an expert on the necessity, reasonableness, and value of attorney's fees.'" *Denney v. Winton,* 184 S.W.3d 110, 119 (Mo.App.

---

**13.** Recall, that the Restatement (Second) of Torts section 633, comment b, describes slander of title as a form of the general tort of publication of an injurious falsehood, and the rules on liability for the publication of an injurious falsehood also apply to slander of title. *See Rorvig,* 873 P.2d at 497.

2006) (quoting *Travis v. Travis,* 174 S.W.3d 67, 71 (Mo.App.2005)). "It is entirely within the trial court's discretion whether to award attorney fees, and an appellate court will interfere with an attorney fee award only on a showing of abuse of discretion." *Denney,* 184 S.W.3d at 119. "To demonstrate an abuse of discretion, the complaining party must show that the trial court's decision was so against the logic of the circumstances, and so arbitrary and unreasonable as to shock one's sense of justice." *Id.* Based on our review of the record, we cannot say the trial court abused its discretion in granting attorney's fees in the amount of $1,814.67 to Respondents as special damages, because this amount correlated with the issues relating to Respondents' claim for reimbursement of attorney's fees in clearing their disparaged title resulting from the filing of Appellant's mechanic's lien. Under these circumstances, the trial court did not err in awarding attorney's fees as special damages in this slander of title action. Point II is denied.

In his third point relied on, Appellant maintains the trial court abused its discretion in permitting Ms. Short to testify on the issue of damages resulting from Respondents' trespass on his property. Specifically, he complains that Ms. Short "was not disclosed by [Respondents] as an expert intended to be called at trial in response to ... interrogatory number two, and her testimony was therefore an unfair and prejudicial surprise to [Appellant];" that Appellant's

> prior identification of Ms. Short as a potential expert witness ... did not entitle [Respondents] to call her as an expert without their own disclosure, because (i) [Appellant] determined before trial that she had a business relationship with [Respondents'] counsel and determined not to call her as an expert and

orally withdrew her identification as an intended expert prior to her testimony at trial, (ii) she based her opinions upon new or different facts developed shortly before trial, and (iii) the trial court did not offer [Appellant] any opportunity to interview or depose Ms. Short before she was allowed to testify[;]

and "[t]here was no adequate foundation laid ..." for Ms. Short's opinion testimony relating to the value of Appellant's land.

At trial, following the close of the cases in chief presented by Respondents and Appellant, Respondents called Ms. Short, a real estate appraiser, as a surrebuttal expert witness on the valuation of the parties' properties. Appellant's counsel objected on the ground that Ms. Short had not been properly disclosed as an expert witness by Respondents, and that, in fact, Appellant had previously disclosed Ms. Short as his own expert witness. Counsel for Respondents argued that because Appellant had disclosed Ms. Short as a potential witness he could call her as an expert. Appellant's counsel argued that he believed Respondents "have to identify their own experts if they want to use them at trial...." Appellant's counsel also re-iterated to the trial court that he had no intention of calling Ms. Short as a witness at trial and that he had never actually employed her as an expert witness although he had disclosed her as a possible witness during discovery. When the trial court announced its intention to allow Ms. Short to testify, Appellant's counsel then withdrew his disclosure of Ms. Short as a potential expert witness for Appellant.

Ms. Short testified that in preparation for her testimony she had examined photographs of Appellant's property and looked at twenty-eight property cards from the county assessor's office to obtain comparable prices for property in their area.[14] She

---

14. She related she had pulled the property cards in the past and she "pulled [them] from

stated she had been approached by Appellant at some point to be an expert witness for him, but ultimately did not even meet with him and pursue such a relationship.[15] She testified she and Appellant came to a mutual agreement that she would not be an asset to his litigation because she

> couldn't support the cost to cure [amount that was determined by] the environmentalist[, Ms. Yarbrough]. It was like $15,000 or something ... [a]nd knowing [her testimony relating to] price per acre was only [$]2,200, [she] didn't feel like [Appellant] would be getting [his] money's worth to pay [her] for a service that [she] didn't support or that [she] spent money on to obtain.

She further related that Respondents' counsel contacted her in November of 2007 and asked her to testify. She stated she had dealt with Respondents' counsel in the past and he was aware of her hourly fees.[16]

We begin our examination of this exhaustive point relied on by determining if the trial court erred in permitting Ms. Short to testify because she was not disclosed as a witness for Respondents prior to trial and Appellant was not given an opportunity to "interview or depose Ms. Short before she was allowed to testify."

In part, "Rule 56.01(b)(4)(a) requires the disclosure of experts expected to be called to testify at trial." *St. Louis Cty. v. Pennington,* 827 S.W.2d 265, 266 (Mo.App.1992). "It is well established that the trial court has broad discretion to choose a course of action during trial when evidence is challenged on the ground that it has not been disclosed by answers to interrogatories." *Manahan v. Watson,* 655 S.W.2d 807, 808 (Mo.App.1983); *see St. Louis Cty.,* 827 S.W.2d at 266. "In the sound exercise of that discretion, the trial court may admit or reject such evidence, or otherwise determine and impose appropriate sanctions for violations of rules governing interrogatories." *Id.*

Citing to *Wilkerson v. Prelutsky,* 943 S.W.2d 643 (Mo. banc 1997), and *Dunn v. Wal-Mart Stores, Inc.,* 909 S.W.2d 728 (Mo.App.1995), Appellant argues that the trial court should have *sua sponte* offered him some type of relief such as an opportunity to interview Ms. Short or it should have granted a continuance to depose her prior to her being able to testify at trial.[17] However, the foregoing cases do not stand for that proposition. Indeed, Appellant cites no case law which specifically puts a burden on the trial court to grant such

---

the market [the day before trial] to make sure [she] had the most recent value."

**15.** Appellant testified that he had approached Ms. Short about testifying for him early on in the litigation. When he discovered that she had property interests associated with the law firm that represents Respondents, he felt it would be a conflict of interest and unwise to employ her.

**16.** Counsel for Appellant continuously objected during Ms. Short's testimony on the basis that she was not properly disclosed as an expert witness and that there was a lack of foundation for her testimony.

**17.** Appellant also cites this Court to *One Thousand Bates Redevel. Corp. v. Guelker,* 883 S.W.2d 103, 105 (Mo.App.1994) (holding that the trial court did not abuse its discretion in allowing an undisclosed witness to testify where the defendant's counsel was given but refused an opportunity to interview the witnesses prior to their testimony), and *Gassen v. Woy,* 785 S.W.2d 601, 604 (Mo.App.1990) (holding that the trial court did not abuse its discretion in allowing medical expert testimony where the plaintiff's lawyer was given but declined an opportunity to interview the expert before he testified). These cases are of limited benefit to Appellant's argument because they stand for the proposition that it was not erroneous for the court to offer such relief, not that it was *required* to do so.

relief *sua sponte* where a party made no such request on his own.[18]

■ As previously related, a trial court has "broad discretion to choose a course of action during trial when evidence is challenged on the ground that it has not been disclosed by answers to interrogatories." *Manahan*, 655 S.W.2d at 808. "The very nature of the discretion vested in the trial court recognizes that each case must be determined on its own peculiar facts which bear on the question of whether that discretion has been abused." *Dunn*, 909 S.W.2d at 734 (quoting *Gassen*, 785 S.W.2d at 604). Even the case cited by Appellant, *Wilkerson*, 943 S.W.2d at 647–48, observed that "[t]he trial court has broad discretion to control discovery" and "[t]his discretion extends to the trial court's choice of remedies in response to the non-disclosure of evidence or witnesses during discovery."

■ Here, Appellant asked merely that Ms. Short be excluded from testifying and he did not request any additional remedies from the trial court. The trial court was under no obligation to *sua sponte* offer additional remedies although it was within its province to do so if it had chosen such a course of action. Further, the trial court in its sound discretion had the power to admit or reject such evidence as it saw fit. *Gassen*, 785 S.W.2d at 604. Given the circumstances of the case, the trial court did not abuse its discretion in permitting Ms. Short to testify although not expressly disclosed prior to trial.[19]

Also under this point relied on, Appellant takes issue with the foundation laid for Ms. Short's opinion testimony. He asserts that her methodology in examining comparable property in the vicinity of the parties' property was not an acceptable reference upon which to base a reliable opinion and "she based her opinions upon new or different facts developed shortly before trial."

At trial, Appellant objected to the testimony of Ms. Short on several grounds other than his objections to her non-disclosure. Initially, he objected on the basis that "[t]here's no foundation ..." because "the witness has never viewed the property." The trial court overruled the objection and allowed counsel for Respondents to continue his questioning of Ms. Short. Appellant then objected on the basis that the "comparables" reviewed by Ms. Short were not being entered into evidence and this objection was overruled by the trial court. Appellant's counsel again objected that "[t]here's still not a foundation laid for this opinion, and that is coupled with the fact that she has not even viewed the property." This objection was overruled. Thereafter, Appellant's counsel again objected to the fact that the property cards used to determine the comparables were not before the court and he was again overruled. Further, Appellant's counsel then objected that "[t]here is no foundation for her to give an opinion as to the

18. It is an appellant's burden to " 'cite appropriate and available precedent if he expects to prevail, and, if no authority is available to cite, he should explain the reason for the absence of citations.' " *Brown v. Ameristar Casino Kansas City, Inc.*, 211 S.W.3d 145, 148 (Mo.App.2007) (quoting *Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978)).

19. Appellant also argues that his "prior identification of Ms. Short as a potential expert witness that [he] intended to call at trial did

not entitle [Respondents] to call her as an expert witness without their own disclosure...." Having found the trial court did not abuse its discretion in allowing her to testify despite her not being disclosed in interrogatories prior to trial, we need not address this issue as it matters not that she was first disclosed by Appellant as a possible expert witness. In either event, the trial court was within its power to allow her testimony.

diminution in value when she's never inspected [the property]." Finding that it did not "know of anything that says she has to view something in order to make a determination," the trial court overruled the objection.

▪▪▪▪ "The trial court's decision to allow evidence at trial is reviewed for an abuse of discretion." *In re Van Orden,* 271 S.W.3d 579, 587 (Mo. banc 2008). Further, " '[t]he determination of whether a sufficient foundation was laid for admission of the evidence is within the sound discretion of the trial court.' " *Healthcare Servs. of the Ozarks, Inc. v. Copeland,* 198 S.W.3d 604, 616 (Mo. banc 2006) (quoting *In the Estate of West v. Moffatt,* 32 S.W.3d 648, 653 (Mo.App.2000)). Section 490.065.3 provides that with respect to evidence relied upon by experts, "facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable." [20] Indeed, "an expert may base his opinion on facts and data derived from sources outside of court and other than by his own perceptions." *Scott v. Blue Springs Ford Sales, Inc.,* 215 S.W.3d 145, 175–76 (Mo.App.2006).

▪▪▪ Here, Ms. Short had previously met with Appellant and was shown photographs of the property and the brush pile at issue was described to her. She also talked with Respondents regarding the land in question. Furthermore, her testimony was based upon comparable sales [21] by way of property cards showing valuation of properties obtained from the Texas County Assessor's office. Pursuant to section 490.065.3, she was entitled to testify as to these out-of-court records in view of the fact that they were of a type reasonably relied upon by experts in the field. She also related she had twenty-two years of experience appraising property in Texas County and other surrounding counties, and she determined that "the price per acre less the cost-to-cure [by 'cleaning of the debris'] would be the market value ..." of the land in question. She also opined that "in this part of the country you cannot find [twenty] acres that doesn't have something somewhere on it that isn't perfect" and that "based on [her] information ... [Appellant's property is] a land Class 7, which is brush ... and rolling" which is "not productive in the ... sense of pasture or cattle—or crops, [and] ... you would expect a brush pile." Further, she related that because "there's not county zoning" one "could burn [the brush pile] and remove the debris." Ms. Short ultimately concluded that the market value of Appellant's property was reduced by approximately $2,200.00 per acre such that he was damaged in that amount by Respondents' trespass.

▪▪▪ The trial court did not abuse its discretion in permitting Ms. Short to give expert opinion testimony relating to the diminution in value of Appellant's property as well as the cost to cure the damage which occurred to his property. *Healthcare Servs.,* 198 S.W.3d at 616. Point III is denied. [22]

---

20. All statutory references are to RSMo 2000.

21. *See In re Marriage of Patrick,* 201 S.W.3d 591, 596 (Mo.App.2006) (holding that the comparable sales approach is a valid method for valuing real property).

22. We further note Appellant asserts in this point relied on that Ms. Short's "testimony was ... an unfair and prejudicial surprise to [Appellant]." However, he does not make sufficient assertions and argument as to this issue in the argument portion of his brief. " 'Arguments raised in the points relied on

In his fourth point relied on, Appellant asserts the trial court erred in entering judgment on his trespass claim because the trial court awarded only $3,100.00 in damages where his testimony was that he was damaged in the amount of $15,000.00 and the trial court declined to award him treble damages where there was evidence Respondents removed trees and vegetation from his land.

■■■■■ "It is well established that competent and substantial evidence is required to support an award of damages." *Ozark Employment Specialists, Inc. v. Beeman*, 80 S.W.3d 882, 897 (Mo.App. 2002). In awarding damages, the trial court is "not required to believe the values assigned by [a party] or his expert witnesses" and it "is free to make a finding of value within the range of values testified to at trial." *Coffman v. Powell*, 929 S.W.2d 309, 312 (Mo.App.1996). "Generally, due deference must be given to the trial court's resolution of conflicting evidence." *Id.*

■■■■■ As already related, Ms. Short opined that Respondents' trespass decreased the fair market value of Appellant's property by $2,200.00, which was a figure based on the diminution in value of Appellant's property as well as the cost to cure the damage which occurred to his property. Ms. Yarbrough testified that it would cost $15,000.00 to restore the property to what it looked like prior to Respondents' trespass. Appellant testified that based on his "rule of thumb" calculations the fair market value of his property was decreased by $15,000.00.

■■■■■ While we agree with Appellant's assertion that "[a]n owner of real property while not an expert is still competent to testify as to the reasonable market value

of his land," a trial court is always "free to believe none, part or all of the testimony of any witness." *Ridgway*, 126 S.W.3d at 812. Having already found in Point III above that Ms. Short's testimony was properly before the trial court, the trial court here was presented with evidence that the property was damaged in the amount of $2,200.00 and in the amount of $15,000.00. The $3,100.00 awarded by the trial court was within the range of values offered at trial and we defer to the trial court's determination of damages. *See Coffman*, 929 S.W.2d at 312. The trial court did not err in finding Appellant's property was damaged in the amount of $3,100.00 due to Respondents' trespass.

■■■■■ Also under this point relied on, Appellant takes issue with the trial court's determination that he was not entitled to treble damages under section 537.340. Section 537.340.1 states that

[i]f any person shall cut down, injure or destroy or carry away any tree placed or growing for use, shade or ornament, or any timber, rails or wood standing, being or growing on the land of any other person ... or other substance or material being a part of the realty, or any roots, fruits or plants, or cut down or carry away grass, grain, corn, flax or hemp in which such person has no interest or right, standing, lying or being on land not such person's own ... the person so offending shall pay to the party injured *treble the value* of the things so injured, broken, destroyed or carried away, with costs. Any person filing a claim for damages pursuant to this section need not prove negligence or intent.

(Emphasis added.) Actions brought under this section attempt " 'to redress plaintiff

which are not supported by argument in the argument portion of the brief are deemed abandoned and preserve nothing for appellate

review.' " *Coleman v. Gilyard*, 969 S.W.2d 271, 273 (Mo.App.1998) (quoting *Luft v. Schoenhoff*, 935 S.W.2d 685, 687 (Mo.App.1996)).

for injuries that often have intangible qualities, such as aesthetic value, and such damages are often difficult to measure.'" *Hale v. Warren*, 236 S.W.3d 687, 695 (Mo. App.2007) (quoting *Ridgway v. TTnT Dev. Corp.*, 26 S.W.3d 428, 436 (Mo.App. 2000)). "Since [section] 537.340 is a penal statute, it must be strictly construed." *Ridgway*, 126 S.W.3d at 817. However, if "the defendant had probable cause to believe that the land on which the trespass is alleged to have been committed, or that the thing so taken, carried away, injured or destroyed, was his own, the plaintiff in the action or prosecution shall receive single damages only, with costs." § 537.360. "'One would have "probable cause" under the meaning of this section if there is such cause as would induce a reasonable person to believe he had the right to remove trees from another's land.'" *Hale*, 236 S.W.3d at 695 (quoting *Ridgway*, 26 S.W.3d at 436). The burden of proving probable cause lies with the defendant. *Ridgway*, 26 S.W.3d at 436. "'The ultimate decision as to whether treble or single damages should be awarded rests with the trial judge.'" *Hale*, 236 S.W.3d at 695 (quoting *Ridgway*, 26 S.W.3d at 436).

■ Here, the only testimony relating to the removal of trees from Appellant's property came from Appellant and even he admitted he did not see the trees being removed. Both Respondents and Mr. Wetstein testified they did not cause any trees to be removed from Appellant's property. This Court defers to the trial court on issues of witness credibility and the trial court was free to disbelieve the testimony of Appellant. *Kleeman*, 167 S.W.3d at 202.

■ With that being said, at trial Appellant clearly testified that he was not "claiming injury against [Respondents] for those stumps or the cutting of those trees . . .;" that he was "not asking for anything

for the trees that were moved;" and that he was just "asking that the injury to the land be restored." Appellant's testimony waived his argument for treble damages for statutory trespass. "The general rule of law is that 'a party may not invite error and then complain on appeal that the error invited was in fact made.'" *Rosencrans v. Rosencrans*, 87 S.W.3d 429, 432 (Mo.App. 2002) (quoting *Hankins Constr. Co. v. Missouri Ins. Guar. Ass'n*, 724 S.W.2d 583, 590 (Mo.App.1986), *overruled on other grounds by Missouri Prop. & Cas. Ins. Guar. Ass'n v. Pott Indus.*, 971 S.W.2d 302, 305 (Mo. banc 1998)). In the instant matter, the trial court did not err in awarding damages to Appellant in the amount of $3,100.00 and not awarding Appellant treble damages for statutory trespass. Point IV is denied.

The judgment of the trial court is affirmed.

BATES, P.J., and BURRELL, J. concur.