

# In the Missouri Court of Appeals
## Eastern District

### WRIT DIVISION TWO

| | | |
|---|---|---|
| ST. LOUIS COUNTY BOARD OF ELECTION COMMISSIONERS, LISA RIDOLFI, PATRICK LYNN, and LEO MACDONALD, JR., | ) ) ) ) | No. ED104196 |
| | ) | Writ of Mandamus |
| | ) | Circuit Court of St. Louis County |
| Relators, | ) | Cause No. 16SL-CC01246 |
| | ) | |
| vs. | ) | |
| | ) | Honorable Maura B. McShane |
| HON. MAURA B. MCSHANE, | ) | |
| | ) | |
| Respondent. | ) | Filed: June 7, 2016 |

The relators, three registered voters and the St. Louis County Board of Election Commissioners, petitioned this Court for an emergency writ of mandamus, to extend the hours of voting for two hours at certain precincts on the night of the April 5, 2016 election, due to the lack of ballots. We issued a permanent writ of mandamus with our opinion to follow. Here are the circumstances that compelled our issuance of the writ. Rule 84.24(l).

### *Facts*

The Board, as the duly constituted election authority for St. Louis County, conducted a county-wide general municipal election on April 5, 2016. The Board relied solely on paper

ballots for this election.[1] However, due to a clerical error, many precincts did not receive a sufficient number of ballots for the election. The unavailability of ballots denied eligible voters the opportunity to exercise their right to vote. Thus, in the late afternoon of April 5th, the relators petitioned the circuit court for an emergency order extending the voting hours at the affected precincts by two hours, until 9 o'clock in the evening.[2] The Board argued that the extended hours would allow voters to return to their polling places and vote, since the ballots had been replenished.

In seeking an extension of hours, the Board filed affidavits from three St. Louis County registered voters – Leo H. MacDonald, Jr., Lisa Ridolfi, and Terry Crow. All three avowed that they arrived at their polling location early in the morning of April 5th, but were unable to vote due to the lack of ballots. Mr. MacDonald arrived at his polling place at 8:00 a.m. He was unable to wait until a ballot arrived, because he is employed full-time. He stated, however, that extending the hours of voting would permit him to vote. Ms. Ridolfi arrived at her polling place at 6:15 a.m. At that time, there were no ballots for the election at her polling place. The election judges had already turned away approximately twenty voters by the time Ms. Ridolfi arrived, and then turned away approximately one hundred more voters between 6:15 and 10:45 a.m., all due to the lack of ballots. Mr. Crow arrived at his polling place at 5:55 a.m. At that time, the polling location had only five ballots with a certain race printed on the ballot. Mr. Crow attempted to vote at 8:00 a.m., but could not because there were no ballots. Mr. Crow observed approximately forty voters turned away from his polling place between 6:00 and 9:10 a.m. due to the lack of ballots. In all, according to the list filed with the circuit court, at least sixty-three

---

[1] The Board asserted that it had to rely solely on paper ballots because it was unable to reprogram its touchscreen voting machines in the twenty-two days after the March 15th presidential primary election.

[2] Although the Board knew of the insufficient number of ballots early in the morning – by at least 8 o'clock a.m. – the relators did not file their action in the circuit court until 4:20 p.m. Nothing in the record indicates the reason for this delay.

2

precincts, out of a total of eight-hundred and twenty precincts, spread out over the county, did not receive an adequate number of ballots.

The Board's request for an extension of hours was bipartisan. Both the Democratic Director of Elections for the Board, Eric Fey, and the Republican Director of Elections, Gary Fuhr, filed affidavits in support of extending the voting hours. Both admitted that the Board provided an insufficient number of ballots due to a clerical error. Both agreed that voters were denied the opportunity to vote due to the lack of ballots.

In petitioning the circuit court, the Board pointed particularly to Section 115.407, the state statute prescribing the hours of voting, which directs that polls close at seven o'clock p.m. The Board argued that the statute was unconstitutional as applied to the affected precincts. The Board contended that no other adequate remedy existed, and that if Section 115.407 was strictly enforced, and the hours not extended, voters would be denied their constitutional right to vote. The Attorney General, charged with defending the statute's constitutionality, did not oppose granting relief.

The circuit court, after a hearing, denied the Board's request because it did not believe it had authority to extend the hours under Section 115.407.

The Board then petitioned this Court for a writ of mandamus directing the circuit court to order the polls open an additional two hours, until nine o'clock p.m.[3] We granted the request and issued a permanent writ of mandamus. We directed the Board to extend the voting for two hours until nine o'clock that evening at the affected precincts. We further directed that the votes cast

---

[3] This Court became aware of this action during the afternoon of April 5th. From that time forward, we constantly monitored the situation through local media channels, phone calls, and the Missouri Courts' Case.net system. After the Court closed at 5:00 p.m., no fewer than nine court personnel remained at the Court, in order to address any writ petition filed. Those remaining were three judges, the court administrator, the clerk of the court, a deputy court clerk, a judicial administrative assistant, and a judicial law clerk. The circuit court entered its order at approximately 5:00 p.m. The writ petition was not filed in this Court until 7:01 p.m. We formally issued our writ at 7:25 p.m. We fear the issuance of our writ after some polls had closed may have had little remedial effect. But this Court cannot act until and unless a petition is filed, and that did not occur until 7:01 p.m.

3

during the extended hours were provisional votes, to be sequestered from the regular votes. And we directed that the provisional voting was available only to those qualified voters who orally affirmed that they tried to vote during regular hours.

## Discussion

The Missouri Constitution establishes "with unmistakable clarity that the right to vote is fundamental to Missouri citizens." *Weinschenk v. State,* 203 S.W.3d 201, 211 (Mo. banc 2006). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society." *Reynolds v. Sims,* 377 U.S. 533, 555 (1964). The Board admitted that their failure to provide sufficient number of ballots deprived voters of their constitutional right to vote. And thus they sought redress in the courts to remedy this wrong and afford those disenfranchised the opportunity to cast their vote.

This Court has the authority to "issue and determine original remedial writs." Mo. Const. art. V, sec. 4.1; *State ex rel. Isselhard v. Dolan,* 465 S.W.3d 496, 498 (Mo. App. E.D. 2015). We do not issue such writs lightly. A writ of mandamus is reserved for extraordinary emergencies. *Isselhard,* 465 S.W.3d at 498. The writ of mandamus is to be used only as a last resort, in those cases in which no adequate alternative remedy exists. *State ex rel. Kelley v. Mitchell,* 595 S.W.2d 261, 265-67 (Mo. banc 1980). The object of a writ of mandamus is "not to supersede but to supply the want of a legal remedy." *Kelley,* 595 S.W.2d at 266-67.

In reaching our decision, we were mindful of both Section 115.407, the state statute governing hours for the polls, and the prior opinion of our court, *State ex rel. Bush-Cheney 2000 Inc. v. Baker,* 34 S.W.3d 410 (Mo. App. E.D. 2010), in which we held that the circuit court could not extend the hours of voting established by statute. But the particular circumstances at hand compelled our decision to extend the voting hours.

4

Section 115.407, upon which the circuit court relied, provides:

The election judges shall open the polls at six o'clock in the morning and keep them open until seven o'clock in the evening. At seven o'clock in the evening, all voters at the polls, including any in line to vote, shall be permitted to vote.

We acknowledge that the plain language of the statute provides that the polls are to close at seven o'clock in the evening. Indeed, this language is reinforced by the seemingly absolute language of Section 115.430.14: "No state court shall have jurisdiction to extend the polling hours established by law, including section 115.407."[4]

But we must consider these laws in the context of other election laws, caselaw, and the constitutional right to vote. We need only look as far as Section 115.024 to see that the legislature has contemplated and considered that emergencies may arise – be it from natural or man-made disasters – that may impact voting.[5] The legislature has provided mechanisms to

---

[4] We construe the term "jurisdiction" to mean "authority." *See, generally, State ex rel. Watson v. Sherry*, 436 S.W.3d 718, 722 (Mo. App. E.D. 2014); *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249, 255 (Mo. banc 2009).

[5] Section 115.024 provides:

Elections rescheduled or relocated due to disaster, definition--election panel established--petition to reschedule or relocate, contents--order--notice, contents--ballots--procedures--appeal

1. As used in this section, "disaster" means any catastrophic or natural disaster, statewide or nationwide emergency, man-made disaster, civil disorder, insurgency, bioterrorism attack, terrorist attack, or enemy attack.

2. The supreme court shall by rule establish a panel in each district of each court of appeals of the state to consider petitions filed under this section. Each panel shall consist of three court of appeals judges from such district, and shall be known as the "election panel" of the district in which it is established.

3. In the event that any disaster prohibits any election from occurring on the day the election is required to be held under this chapter, the election authority of the city or county in which the election was to be held may petition the election panel of the district in which the city or county is located for the election panel to authorize a relocation of the polling places affected by such disaster, or to schedule a new date upon which the election authority may conduct the election. The petition shall include the following:

(1) A description of the event prohibiting the election from occurring;

(2) A statement of the reasons the election cannot be held on the day required by law;

(3) The election authority's recommendation for relocation of the polling places or the new date upon which the election shall be held;

(4) A statement of the plan for providing notice to voters of the new location or new date of the election;

(5) A statement that the election authority will be able to conduct the election at the recommended location or on the recommended new date in the same manner as the election would have been conducted had the disaster not occurred.

5

address those emergencies, including authorizing the election authorities to petition this Court to relocate or reschedule the election. Section 115.024.3. Correspondingly, the legislature has authorized this Court to issue orders relocating and/or rescheduling the affected election. Section 115.024.4. And the election authorities may appeal any order issued by the election panel of this Court to the Missouri Supreme Court, for an immediate hearing.[6] Section 115.024.8. While the particular situation at hand is not a legislatively-defined "disaster," the statute evidences the legislature's understanding that emergencies may arise. In fact, the legislature specifically authorized courts trying a contested election to order a new election if there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election. Section 115.593; *See, e.g., Landwersiek v. Dunivan*, 147 S.W.3d 141, 149-50 (Mo. App. S.D. 2004).

We also considered the nearly century-old case, *State ex rel. City of Memphis v. Hackman*, 202 S.W. 7 (Mo. 1918), as support for the proposition that the statutory times for opening and closing polls may be flexible in certain circumstances. There, our Supreme Court held that the statutory time for opening polls was directory, and not mandatory, where no injury resulted from a failure to open the polls at the time designated in the statute. *City of Memphis*,

---

4. If satisfied that the election authority will be unable to conduct the election as required by this chapter and that the recommended relocation of the polling places or new date of the election will allow voters to vote as provided by law, the election panel shall issue an order to the election authority to relocate the polling places or to conduct the election on the new date as set by the election panel.

5. The election authority shall provide notice to all voters in the election authority's jurisdiction in the same manner as required for elections by this chapter, provided that the requirements for the date and time of providing such notice in this chapter shall not apply. Notice of the election shall include a copy of the order issued by the election panel.

6. The election authority may use the same ballots that were printed for the election that was relocated or rescheduled under this section, unless such ballots were damaged, destroyed, lost, or spoiled by the disaster.

7. All procedures for voting, counting of votes, and contesting elections required under this section shall apply to any election relocated or rescheduled under this section, provided that any requirements for deadlines under this chapter that cannot be met because of the relocation or rescheduling of the election shall be rescheduled by the election panel.

8. The election authority may appeal any order issued by the election panel under this section to the supreme court, and the supreme court shall hear such appeal immediately.

[6] By Supreme Court Operating Rule, this right to appeal may be had by filing a petition for writ of mandamus with the Supreme Court. Operating Rule 24.01(b).

6

202 S.W. at 14. Failure to open up the polls at the time designated by statute was insufficient to vitiate the election in *City of Memphis*, where no harm came from the delayed opening. *Id.* Conversely then, there can be flexibility in the closure of the polls, when injury would result from strict compliance with the statutory time.

*Bush-Cheney* grew out of the presidential election in November of 2000. In that case, three Democratic Party entities and one registered voter sued the St. Louis City Board of Election Commissioners, seeking an extension of voting hours until ten o'clock p.m. in all locations.[7] They alleged that the voter had not been able to vote and "fear[ed]" he would not be able to vote because of the long lines at the polling places/machine breakdowns that had lasted for several hours. They further alleged that "numerous" other voters in the city had been unable to exercise their constitutional right to vote due to the Board's failure "to properly provide enough voting booths, voting rolls, and other supplies and equipment necessary and appropriate for the polling places," as required by law. And lastly, they alleged that due to the large turnout and an inadequate number of polling places, "many otherwise eligible voters would de facto be denied their right to vote." The circuit court ordered voting hours extended at all polling places in the City of St. Louis until ten o'clock that evening. *Bush-Cheney*, 34 S.W.3d at 411.

The City Election Board and a Republican entity, Bush-Cheney 2000, Inc., separately petitioned for a writ of prohibition, seeking to prohibit the circuit court from enforcing its order. We granted those petitions and issued writs of prohibition, holding that the trial judge lacked jurisdiction to extend the hours of voting established by Section 115.407. *Id.* at 412. Our decision rested on two main grounds. First, no one addressed or challenged the constitutionality of Section 115.407. Thus, the circuit court made no finding that Section 115.407 was

---

[7] Thee three Democratic Party entities were: The Gore and Lieberman 2000 Committee, Inc., The William L. Clay, Jr. Campaign Committee, and the Missouri State Democratic Committee.

7

unconstitutional either as written or as applied. Therefore, our decision was dictated by well-established law, which holds that unless constitutionally infirm, the courts are obligated to follow and apply the law as written by the legislature. *Id.* Secondly, the requested relief would not remedy the alleged problems. The potential voter complained of long lines and feared he would not be able to vote. But, we noted, under Section 115.407, any voter in line at seven o'clock would eventually be permitted to vote. We reasoned that if any voters in line at seven o'clock were unwilling or unable to stay and vote, their inconvenience would not be lessened by extending hours in which new voters could join the line. And we observed that the extension of hours ordered -- holding all polling places open until ten o'clock -- simply permitted voting by persons not entitled to vote due to the failure to come to the polls on time. *Id.*

This case is readily and entirely distinguishable. Here it was the election authority itself that requested the extension of hours. And the request was bipartisan -- both the Democratic and Republican Directors of Elections supported granting relief to the disenfranchised voters. The harm here was real, not speculative as in *Bush-Cheney*. The Board admitted that it had disenfranchised voters. We granted relief not because of inconvenience or speculation, but because of the very real lack of ballots and the total disenfranchisement of affected voters. And the relief granted afforded a remedy to the problem at hand, where no other adequate remedy existed. The April 5th election was scheduled that day, from 6 o'clock in the morning until 7 o'clock in the evening. Sections 115.121.3 and 115.407. Although spurned voters were informed that they could proceed to the Board's headquarters in Maplewood to vote, this did not effectively cure the voters' disenfranchisement. For instance, Mr. MacDonald could not vote unless the polling hours were extended, due to his employment schedule.

8

Although we are obligated to follow and apply the law as written by the legislature, even *Bush-Cheney* recognized that we are not so obligated if the law is constitutionally infirm. The relators here specifically and expressly alleged that Section 115.407 as applied to the affected precincts was an unconstitutional denial of voters' rights. And the Attorney General, charged with defending the statute's constitutionality, voiced no objection to granting relief to the disenfranchised voters. Indeed, if Sections 115.407 and 115.430.14 were strictly enforced, and the polling hours not extended, then voters would have been denied their fundamental right to vote. This is not a case where relators directly attacked the constitutionality of the statue. Mandamus does not lie to directly challenge and thereby determine the validity or constitutionality of an ordinance or statue. *State ex rel. City of Crestwood v. Lohman*, 895 S.W.2d 22, 27 (Mo. App. W.D. 1994); *State ex rel. Seigh v. McFarland*, 532 S.W.2d 206, 208-09 (Mo. banc 1976). The purpose of mandamus is to execute and not to adjudicate. *City of Crestwood*, 895 S.W.2d at 27. There is a difference between a statute that is wholly unconstitutional, and thus void *ab initio* – for instance, one that cannot be constitutionally applied in any circumstance – and a statute that is otherwise constitutional but rendered unconstitutional when applied to a particular person or group of people. *See, e.g., Strahler v. St Luke's Hospital*, 706 SW.2d 7 (Mo. banc 1986)(holding unconstitutional the statutory limitation period for actions against health care providers, when applied to minor medical-malpractice claimants); *State v. Perry*, 275 S.W.3d 237 (Mo. banc 2009)(addressing both a facial and as-applied challenges to statute); *State ex rel. Chiavola v. Village of Oakwood*, 886 S.W.2d 74, 77 (Mo. App. W.D. 1994)(noting that an ordinance may be either facially unconstitutional or unconstitutional as applied). And that is what the relators contended here – that Section 115.407 was unconstitutional when applied to the affected precincts. The validity of a law may be

9

brought into question when efforts are taken to enforce that law. *City of Chesterfield*, 895 S.W.2d at 27-8. In such circumstances, when a statute is unconstitutional as applied, Missouri courts have employed their authority to issue a remedial writ. *State ex rel. Bloomquist v. Schneider*, 244 S.W.3d 139 (Mo. banc 2008)(finding state statute unconstitutional as applied; writ of prohibition issued).

In ruling against an extension of time in *Bush-Cheney*, we made a number of observations regarding the voting process. We noted that "commendable zeal to protect voting rights must be tempered by the corresponding duty to protect the integrity of the voting process." *Bush-Cheney*, 34 S.W.3d at 413. And we insisted that "equal vigilance is required to ensure that only those entitled to vote are allowed to cast a ballot." Otherwise, we noted, "the rights of those lawfully entitled to vote are inevitably diluted." *Id.* We believe we addressed these concerns here. We narrowly tailored our relief, allowing only those affected precincts to remain open, and then allowing only those voters to vote who orally affirmed that they had tried to vote during regular voting hours. Further, we ordered that those votes were provisional votes, to be sequestered from the regular votes. The relief granted protected both the integrity of the voting process and the voters' constitutional right to vote.

It is often said that a writ of mandamus is proper where it is necessary to prevent injustice or great injury. *See, e.g., State ex rel. Thomas v. Neill*, 260 S.W.3d 441, 443 (Mo. App. E.D. 2008); *State ex rel. Tanner v. Nixon*, 310 S.W. 3d 727, 729 (Mo. App. W.D. 2010); *Joyce v. Baker*, 141 S.W.3d 54, 56 (Mo. App. E.D. 2004). Such was the case here. We emphasize the extraordinary circumstances present here. The writ sought here was not sought by merely a disgruntled individual or a losing candidate, but by the election authority itself. The Board admitted that their failure to provide sufficient number of ballots deprived voters of their

constitutional right to vote. The writ was not sought for partisan or strategic advantage. The claimed disenfranchisement was not of a trivial character and might cast doubt on the election's validity. Literal application of sections 115.407 and 115.430.14 would have denied voters their fundamental right to vote. The Attorney General voiced no objection to the relief sought. No other adequate remedy was available. The relief afforded was narrowly tailored to protect the integrity of the voting process. Mandamus was proper here to prevent an injustice.[8]

_____
LAWRENCE E. MOONEY, PRESIDING JUDGE

LISA VAN AMBURG, C.J.,
GARY M. GAERTNER, JR., J., concur.

_____

[8] We note that we altered the relief normally afforded by mandamus. Normally our writ would order the circuit court judge to remedy the injustice. Here, because the need was great and the hour late, our writ directly ordered the election authorities to extend the voting hours for the voters in the affected precincts.

11